[This opinion has been published in *Ohio Official Reports* at 69 Ohio St.3d 183.]

THE STATE OF OHIO, APPELLEE, *v*. FOX, APPELLANT.

[Cite as *State v. Fox*, 1994-Ohio-513.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 92-2019—Submitted January 25, 1994—Decided May 4, 1994.)

Appeal from the Court of Appeals for Wood County, No. 90WD067.

———————————

{¶ 1} On September 14, 1989, Leslie Keckler applied for a waitress job at a Bowling Green restaurant. Defendant, Richard E. ("Dick") Fox, worked there as a grill cook. As Keckler filled out her job application, Fox pointed out Keckler to a coworker and said, "I'd like to have some of that." At Fox's request, the restaurant manager showed Fox the job application, which included Keckler's telephone number.

{¶ 2} Sometime after September 14, Keckler told her boyfriend, girlfriend, and mother about an exciting restaurant supply job opportunity. Keckler described the job to her girlfriend and said that she had an interview. According to Keckler's mother, her daughter was very excited about this "sales route" job, which involved selling supplies such as towels and aprons to local area restaurants.

{¶ 3} On the evening of September 26, Keckler went to the Holiday Inn where a job interview for the sales route job was to take place. Keckler's boyfriend saw her just before she left. Keckler told him she might be gone for two or three hours while she went over the sales route. When Keckler did not come home that night, her boyfriend and mother filed a missing persons report with police. Police found the car Keckler had been driving abandoned at the Woodland Mall.

{¶ 4} On September 30, two boys riding bicycles found Keckler's body in a rural drainage ditch. Keckler was still wearing her new black dress and leather jacket. However, a clasp on her brassiere was broken, her belt was unbuckled, two

dress buttons were missing, and her pantyhose were torn in the crotch.  Aside from a nearby shoe, police found no other evidence at the scene.

{¶ 5} Keckler had died as a result of asphyxia from ligature strangulation and multiple stab wounds.  She had been stabbed six times in the back; three stab wounds penetrated her lungs.  Her right wrist had a deep gash, and her face had bruises on her left eye, upper lip, and nose consistent with blunt force injury.  The coroner found no signs of sexual molestation.

{¶ 6} The evidence at trial later showed that at the hotel, Keckler had met Fox, who later stabbed her six times, strangled her with a rope, dumped her body into a ditch, and then drove home.  The facts surrounding Keckler's abduction reminded police of an incident several months earlier involving Marla Ritchey and an unknown man who called himself "Jeff Bennett."  In May 1989, Marla Ritchey had applied for a waitress job at a Bowling Green restaurant.  Fox then worked at that restaurant.  Some days later, arrangements were made for Ritchey to go to the Bowling Green Holiday Inn for an 8:00 p.m. "job interview."  At the Holiday Inn, Fox, calling himself Jeff Bennett, told Ritchey that he worked for Great American Foods, and they needed a local sales representative.  Ritchey agreed to accompany "Bennett" in his car that evening to discuss the job.

{¶ 7} After driving a distance and parking, Bennett (Fox) told Ritchey he thought her dress was too long.  Eventually, Ritchey decided this was a "fake interview" and told Fox she was not interested in the job.  Fox then asked what Ritchey would do if someone "pulled a knife" on her and asked her for money, or asked her "to do other things."  When Ritchey jumped out of the car, Fox tried to grab her and said "come back, that he wasn't finished with [her] yet."  Ritchey immediately reported the May incident to the police and helped them prepare a composite police sketch of Bennett.

{¶ 8} Because of the similarity between Keckler's abduction and the earlier Ritchey incident, police circulated an updated composite sketch of "Bennett," the

2

man Ritchey had met. Police thought he might be a suspect in Keckler's abduction. On October 2, an acquaintance of Fox told police that this composite sketch resembled Richard Fox of Tontogany. Police confirmed that Fox matched Ritchey's description of "Bennett," and Fox's car also matched the description of "Bennett's" car.

{¶ 9} On October 2, police secured a warrant to search Fox's car and the home where Fox lived with his parents. Then, Detective Sergeant Thomas Brokamp and Investigator John Helm drove there. Fox consented to a police search of the house and his car.

{¶ 10} After other officers conducted the search and found some suspicious items, Fox agreed to go voluntarily to the police station, where he waived his *Miranda* rights and agreed to talk further with police. Before Fox was placed under arrest, he admitted that in early May he had worked at a restaurant where Marla Ritchey had applied for a job, that he met Ritchey at the Holiday Inn, and that he took her for a drive and discussed her skirt length.

{¶ 11} Fox also admitted he knew Keckler and claimed they had met and talked at the restaurant where he worked and met again a couple of days later. He described his encounter with Keckler at the Holiday Inn on September 26 as a date. Later, at the mall, "he saw Leslie and they talked and ended up taking a drive in his car."

{¶ 12} Fox said that, after driving for a while, he and Keckler parked, and "things were getting warmed up." However, "then Leslie did not want to participate." She called him "an asshole and started to get out of the car." Fox told detectives, "no one calls me an asshole." Then "he grabbed Leslie by the coat as she was standing up to get out of the car and pulled her back in," and he "pulled the coat up over her head." Fox got a knife out of the glove compartment and "stabbed her in the back 4 or 5 times." Then, he "got the rope out of the trunk 'just to make

sure she was dead' [and] strangled her." Police terminated the interview when Fox asked for a lawyer.

{¶ 13} During the interview, Fox also described another remote rural location. At that location, police subsequently recovered Keckler's purse, her notebook, a letter she had written, her other shoe, a button from her dress, and a piece of nylon cord. Forensic examination of Fox's car revealed blood on the front passenger seat, door, and window. Samples tested were Keckler's blood type. In Fox's garage, police found a fillet knife and a thin nylon rope; both had blood on them.

{¶ 14} A grand jury indicted Fox for kidnapping and aggravated murder with a felony-murder death penalty specification alleging kidnapping. After Fox's motion for a change in venue was overruled by the trial court, Fox waived a jury and tried the case to a three-judge panel.

{¶ 15} At the guilt phase, Fox's retained counsel conceded that Fox had killed Keckler but disputed that the evidence established kidnapping. The parties stipulated that Fox had no criminal record. On cross-examination, some witnesses testified to Fox's good character and hard work. Despite his arguments, the three-judge panel convicted Fox as charged.

{¶ 16} At the sentencing hearing, Fox presented several character witnesses and expert witnesses who testified regarding his mental condition. Testimony from his mother and Dale Fox, his adoptive father, established that Dick's natural father, Walter Low, drowned before Dick was born. Two and one-half years after Low died, Fox's mother married Dale Fox; they moved to Tontogany and raised Dick and their own two daughters. Dale adopted Dick when he was twelve years old because the different last names of the children caused difficulty. When Dick was adopted, his paternal grandparents refused to have anything more to do with him.

{¶ 17} While growing up, Fox was active in Little League, church activities and Boy Scouts, where he received the "God and Country Award." He played

4

football and baseball throughout high school. He was described as friendly, kind, very energetic, and helpful to others; he also helped around the house a lot, taking good care of the four-and-one-half-acre grounds where the family lived. After high school, Fox attended Owens Technical College, where he studied to be a chef. For the fifteen or so years before his arrest, he worked as a cook, near minimum wages, at twenty different restaurants. In his leisure time, he played softball and other sports and raised rabbits.

{¶ 18} In 1980, Fox moved from his mother's home and married Kim Swinehart. They had a daughter, Jessica, born in 1982. In 1983, he and Kim separated, and Kim died. Fox and his daughter Jessica then moved back into Dale Fox's home and lived there until this offense. Fox's mother took care of Jessica while he was at work. Fox was described as a good father who spent time with Jessica and loved her very much.

{¶ 19} Friends and neighbors who had known Fox his entire life testified as to his good character. The Tontogany postmaster described Fox as gentlemanly, cooperative, and respectable. Fox's teacher at Owens Technical described him as cheerful, outgoing, courteous, sensitive and respectful. A retired minister knew the Fox family as a pillar of the community. As a youngster, Fox was very active in Bible study and church service projects and remained active as an adult. According to the minister, "any man would have been proud to have called him son."

{¶ 20} A good friend of Fox's for twenty years described Fox as very kind. Another friend described Fox as a normal, honest American boy with a good community reputation. Fox's family was very religious and civic minded. A neighbor for thirty years testified Fox was a fine, honest person. Another neighbor believed Fox was a friendly, honest boy from a good Christian home, with a good reputation for honesty and integrity.

{¶ 21} An aunt who helped raise him testified that she loved him very much, and he loved her. Jerry Wiles, a minister engaged to one of Fox's sisters, visited

Fox in jail and testified he was very remorseful and filled with repentance. Reverend Wiles felt Fox was a calming and stabilizing influence over other prisoners.

{¶ 22} A sheriff's lieutenant, deputy sheriff, and corrections officer all described Fox as a model prisoner and a nice man, who was very cooperative and who interacted well with other prisoners. Fox helped set up a prisoners' library and also helped save the life of a diabetic inmate who went into shock.

{¶ 23} A lifelong friend testified that Fox did not have good relations with women, exaggerated his friendships with women, and was a "story teller." Yet, Fox was very honest, and a strong friend whom one could trust.

{¶ 24} Unlike most death penalty cases where the defendants have been subjected to neglect, sometimes mental and physical abuse from family members and have few positive or constructive values, Fox's criminal conduct is strikingly inconsistent with his life experiences and the values he had been taught.

{¶ 25} Two clinical psychologists, Dr. Newton L.P. Jackson, Jr. and Dr. Barbara McIntyre, and a psychiatrist, Dr. Thomas Sherman, testified that Fox suffered from a severe, lifelong, "narcissistic personality" disorder. Nonetheless, no expert described this disorder as a mental disease or defect which rendered Fox substantially incapable of appreciating the difference between right and wrong or conforming his behavior to the law.

{¶ 26} Dr. Jackson testified that as Fox grew older he became more alienated, afraid and alone. Fox was never truly integrated into his family and never developed any satisfactory relationships with women. Fox's IQ was ninety-one, at the bottom of the normal range, and he had trouble understanding human relationships and processing ideas and thoughts.

{¶ 27} Family members never knew about Fox's "narcissistic personality." Dr. Jackson agreed this disorder was characterized by "extreme feelings of inferiority," "grandiose fantasies," and "extreme envy" and "hostility toward

women." Fox created a fantasy and lived "within that fantasy" to shield himself from the truth of his lack of self-worth. Although "very emotional," Fox had little control over his emotions.

{¶ 28} Fox developed a lifelong pattern, believing that women could give him what he lacked, "unconditional feelings of regard"; instead, they rejected him. Rejection by Kim, his deceased wife, devastated him. After Jill, his former fiancee, rejected him in April 1989, Fox became depressed, more "irritable" and "aggressive," less communicative, and more inclined to "exert power" over women to "achieve their respect."

{¶ 29} Dr. Jackson believed that when Fox killed Keckler, he "lost control" as a result of his severe personality disorder. Keckler's "asshole" comment "stripped away Mr. Fox's ability to deceive himself." He erupted in "rage" against Keckler, a symbol of lifetime injuries and slights. Thus, this was a "panic" or "impulsive" murder.

{¶ 30} Dr. Sherman, the psychiatrist, described Fox as extremely bitter, envious of others, and prone to rationalizations and grandiose fantasies to compensate for a lack of self-esteem. Persons with a narcissistic personality disorder typically achieve very little, suffer a striking inability to integrate into their environment, and rationalize shortcomings rather than try to improve themselves. Fox suffered from an "intermingling of sexual and aggressive impulses."

{¶ 31} Dr. McIntyre described Fox as impulsive, with excess energy, outgoing, talkative, and suffering from a delusional sense of self-importance. Testing revealed Fox to have problems in anger control, negative attitudes and depression. Neither Sherman nor McIntyre believed that Fox was totally honest when describing the circumstances of the offense.

{¶ 32} All of the expert testimony tends to diminish the weight to be given the positive character testimony. In a brief unsworn statement, Fox said he was very sorry for the offense and felt unworthy to be part of any family. He prayed

that in his remaining time, he would keep his daughter from making the same mistakes he did. When arrested, he felt relieved that someone was finally going to help him. Since he has been in jail, he has seen himself in a different light. He asked that his life be spared so that he could help others.

{¶ 33} After considering this sentencing evidence, the trial panel sentenced Fox to death. The court of appeals affirmed the conviction, and in a two-to-one decision found the death penalty to be appropriate and affirmed that penalty.

{¶ 34} The cause is now before this court upon an appeal as of right.

_____

*Alan R. Mayberry*, Wood County Prosecuting Attorney, for appellee.

*Secor, Ide & Callahan*, *John J. Callahan* and *Jeffrey M. Gamso*; and *Harry R. Reinhart*, for appellant.

_____

**MOYER, C.J.**

{¶ 35} We have reviewed Fox's eight propositions of law, independently assessed the evidence relating to the death sentence, balanced the aggravating circumstance against the mitigating factors, and compared the sentence to those imposed in similar cases. As a result, we affirm the convictions and sentence, including the death penalty.

I

PROCESS

A. *Change of Venue*

{¶ 36} In his fifth proposition of law, Fox argues that the prosecutor committed egregious misconduct by placing Fox's confession on the public record, thereby causing extensive pretrial publicity. Fox argues that only a change of venue could have vindicated his fair trial rights.

{¶ 37} Following Fox's arrest, his counsel submitted a discovery request to the prosecutor, including a request for copies of any pretrial statements by Fox. The prosecutor promptly responded, and that response included copies of the detective's notes reflecting Fox's oral confession. The prosecutor also filed his discovery response with the clerk of courts, readily making it available to the public.

{¶ 38} Following the discovery of Keckler's body and Fox's arrest, newspapers and T.V. stations in Bowling Green and neighboring cities extensively publicized the case, including details of Fox's confession. The trial court rejected Fox's motion for a change of venue. In March, Fox waived his right to a jury trial, and no attempt to seat a jury was ever made.

{¶ 39} Fox questions the prosecutor's conduct and motive in filing the discovery response, thereby making Fox's confession publicly available. We agree with the conclusion of the court of appeals that the prosecutor erred by filing with the clerk of courts the documents requested by defendant's counsel pursuant to Crim.R. 16. The dangers pretrial publicity may present to the constitutional rights to a fair trial are obvious.

{¶ 40} However, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71

L.Ed.2d 78, 87. Accord *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293, 301.

{¶ 41} In this case, Fox received a fair trial before an impartial three-judge panel, and the prosecutor's act in filing the response to the request for discovery did not prejudice Fox. Fox raised no claim here, or at the court of appeals, that the confession was inadmissible. Moreover, judges are presumed in a bench trial to rely only upon relevant, material, and competent evidence. *State v. Davis* (1992), 63 Ohio St.3d 44, 48, 584 N.E.2d 1192, 1196; *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

{¶ 42} "Any decision on changing venue rests largely in the discretion of the trial court. Absent a clear showing of an abuse of discretion, the trial court's decision controls." *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710. See, also, Crim.R. 18; R.C. 2901.12(K); *State v. Spirko* (1991), 59 Ohio St.3d 1, 23, 570 N.E.2d 229. Moreover, the interests of judicial economy, convenience, and reduction of public expenses necessitate that judges make a good faith effort to seat a jury before granting a change in venue. *State v. Warner* (1990), 55 Ohio St.3d 31, 46, 564 N.E.2d 18, 33; *State v. Herring* (1984), 21 Ohio App.3d 18, 21 OBR 19, 486 N.E.2d 119. "It has long been the rule in Ohio that '[t]he examination of jurors on their voir dire affords the best test as to whether prejudice exists in the community ***.'" *State v. Maurer* (1984), 15 Ohio St.3d 239, 250-251, 15 OBR 379, 389, 473 N.E.2d 768, 781, quoting *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.

{¶ 43} In this case, Fox's claim that he was "forced" to waive a jury because of pretrial publicity lacks merit. Because no attempt was made to seat a jury, no proof exists that a fair jury could not have been seated. Even Fox's own expert witness admitted that sixty-two percent of the voters he surveyed in January 1990 said they could put aside any prior knowledge of the case and decide it on the

evidence. By the time of trial, in May 1990, the publicity had lessened considerably. Thus, we reject this proposition of law.

B. *Assignment of Retired Judge*

**{¶ 44}** In his seventh proposition of law, Fox argues that a retired judge is ineligible to sit as a panel member in a capital case. Fox contends his conviction and sentence are void since a retired judge sat on his trial panel. However, Fox's proposition lacks any merit.

**{¶ 45}** Section 6(C), Article IV of the Ohio Constitution specifically authorizes the Chief Justice of this court to assign a retired judge, "with his consent," to "active duty as a judge." In *State ex rel. Berger v. McMonagle* (1983), 6 Ohio St.3d 28, 30, 6 OBR 50, 52, 451 N.E.2d 225, 228, we upheld the propriety of assignment of retired judges, rejecting the argument that "the Ohio Constitution requires a trial judge to have been elected and currently serving his term" to sit upon the trial of a case. And in *Pocker v. Brown* (C.A.6, 1987), 819 F.2d 148, a United States Court of Appeals rejected federal constitutional challenges to retired Ohio judges sitting as trial judges.

**{¶ 46}** Additionally, neither the Constitution nor statutory law restricts the type of case to which a retired judge may be assigned. R.C. 2945.06 regulates capital trials before a panel, but the statute neither excludes retired judges from sitting upon such panels nor implies such an exclusion.

**{¶ 47}** Retired judges are as competent as full-time judges to serve as panel members in capital cases. Contrary to Fox's implication, no logic compels a conclusion that judges who must face reelection challenges are more fair to capital defendants than retired jurists. Moreover, retired jurists represent a valuable judicial resource when they can sit upon capital panels, thereby helping to minimize unnecessary delay in a time of crowded dockets. See *State ex rel. Keefe v. Eyrich* (1986), 22 Ohio St.3d 164, 166, 22 OBR 252, 254, 489 N.E.2d 259, 261. Thus, no

reasons exist to prohibit a retired jurist from sitting on a three-judge panel in a capital case.

### C. *Constitutionality*

{¶ 48} In his eighth proposition of law, Fox challenges the constitutionality of Ohio's death penalty statute. We reject Fox's proposition of law on the authority of *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264.

### II

### SENTENCE ERRORS

### A. *Failure to Comply with R.C. 2929.03(F)*

{¶ 49} In his first proposition of law, Fox argues that the three- judge panel failed to consider mitigating factors and explain why the aggravating circumstance outweighed mitigating factors. Fox relies upon a section of the trial panel's opinion headed, "Why the Aggravating Circumstance is Sufficient to Outweigh The Mitigating Factors." As Fox correctly argues, that section recites only what the panel considered and does not explain why the aggravating circumstance outweighed mitigating factors.

{¶ 50} R.C. 2929.03(F) specifies the findings a trial court or three-judge panel must make when imposing a death sentence. Among other requirements, the statute requires "specific findings" as to "the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors." Fox argues that deficiency was fatal because the panel never answered this "why" question. The dissent in the court of appeals agrees with Fox.

{¶ 51} The trial court's seven-page opinion specified what mitigating factors were unproved or proved and what weight the panel gave to proven mitigating factors. For example, the court described Fox's strong family and religious upbringing as well as his favorable character traits. However, the panel

gave this factor "little weight" because Fox was "given an environment which should have allowed him to be able to follow the laws of our society." The court also recognized his "personality disorders" and "education and experiences" and stated that it gave "due weight" to those factors.

{¶ 52} The panel correctly identified the aggravating circumstance and did not rely upon nonstatutory aggravating circumstances.

{¶ 53} Much of Fox's argument assumes that particular evidence must be given a certain degree of favorable weight. However, "[t]he fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight." *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. "In fact, the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott*, *supra*, 51 Ohio St.3d at 171, 555 N.E.2d at 305. See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, at paragraph two of the syllabus.

{¶ 54} We have previously held that our independent review of a sentence will cure any flaws in the trial court's opinion. *State v. Maurer*, *supra*, 15 Ohio St.3d at 247, 15 OBR at 386, 473 N.E.2d at 778, recognized the importance of a trial court's reasoning in choosing the death penalty. However, *Maurer* held that such a deficiency in reasoning was not prejudicial because the independent reassessments by the court of appeals and this court purged any such error. *Id.*

{¶ 55} In *State v. Lott*, *supra*, 51 Ohio St.3d at 170-173, 555 N.E.2d at 304-306, we also found serious deficiencies in the trial panel's death penalty written opinion. However, we held in *Lott* that these errors were "rectified by this court's careful independent reweighing." *Id.* at 170, 555 N.E.2d at 304. See, also, *Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725; *State v. Landrum*, *supra*, 53 Ohio St.3d at 124, 559 N.E.2d at 729.

{¶ 56} The trial court's opinion in this case causes us to once again admonish trial courts to carefully comply with every specific statutory requirement in R.C. 2929.03(F). As was stated in *Maurer*, *supra*, 15 Ohio St.3d at 247, 15 OBR at 386, 473 N.E.2d at 778, "[t]he failure of a trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances."

B. *Substantial Impairment*

{¶ 57} In his second proposition of law, Fox argues that the mitigating factor specified in R.C. 2929.04(B)(3), substantial impairment of capacity, is proved by evidence of a severe "personality disorder," such as his narcissistic personality disorder. To qualify for the R.C. 2929.04(B)(3) mitigating factor, a defendant must prove that, because of a "mental disease or defect," he "lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct" to legal requirements.

{¶ 58} No expert witness testified that Fox's personality disorder qualified as a "mental disease or defect" or that it deprived Fox of "substantial capacity to appreciate the criminality" of what he did or "conform his conduct" to the law. Dr. Jackson explained that Fox's personality disorder "is not a term which can be brought within the definition of a mental disease or mental defect * * * ." Dr. Sherman, the psychiatrist, asserted it was "quite clear medically that [Fox] did not suffer from a mental disease or defect which rendered him substantially incapable of appreciating right or wrong or conforming his behaviors" to law. Dr. McIntyre also agreed that Fox's personality disorder did not meet the requirements for that mitigating factor.

{¶ 59} Moreover, in other cases, we have recognized that a "personality" or "behavior" disorder did not meet the requirements of R.C. 2929.04(B)(3) as a statutory mitigating factor. See *State v. Richey* (1992), 64 Ohio St.3d 353, 372, 595

N.E.2d 915, 930-931; *State v. Seiber* (1990), 56 Ohio St.3d 4, 9, 564 N.E.2d 408, 415; *State v. Van Hook* (1988), 39 Ohio St.3d 256, 262-263, 530 N.E.2d 883, 889-890.

### C. *Weighing Mitigation*

{¶ 60} In his third proposition of law, Fox argues the trial court erred by intermingling the separate evidence of Fox's alleged mental defect, under R.C. 2929.04(B)(3), with evidence of his history and background. However, that proposition lacks any merit because Fox never proved the mental-defect mitigating factor at trial. Nonetheless, the trial court did consider evidence of Fox's "personality disorder" as a relevant "other factor" under R.C. 2929.04(B)(7).

{¶ 61} A decisionmaker need not weigh mitigating factors in a particular manner. The process of weighing mitigating factors, as well as the weight, if any, to assign a given factor is a matter for the discretion of the individual decisionmaker. See *State v. Mills* (1992), 62 Ohio St.3d 357, 376, 582 N.E.2d 972, 988. "[E]vidence of an offender's history, background and character * * * [not found] to be mitigating, need be given little or no weight against the aggravating circumstances." *State v. Stumpf*, *supra*, at paragraph two of the syllabus.

### D. *Improper Aggravating Circumstances*

{¶ 62} In his sixth proposition of law, Fox argues that both the trial court and the court of appeals relied upon nonstatutory, uncharged, and unproved aggravating circumstances to justify the death sentence. We disagree.

{¶ 63} "R.C. 2941.14(B) limits the aggravating circumstances which may be considered in imposing the death penalty to those specifically enumerated in R.C. 2929.04(A)." *State v. Johnson* (1986), 24 Ohio St.3d 87, 24 OBR 282, 494 N.E.2d 1061, syllabus. Reliance upon nonstatutory aggravating circumstances may constitute reversible error. *State v. Davis* (1988), 38 Ohio St.3d 361, 369-371, 528 N.E.2d 925, 933-934.

**{¶ 64}** Nonetheless, the trial court could appropriately refer to the "manner in which [Fox] planned and executed the events" that led to the kidnapping and murder. Kidnapping was the specified statutory aggravating circumstance. Moreover, "[u]nder R.C. 2929.03(F), a * * * three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf*, *supra*, at paragraph one of the syllabus. See, also, *State v. Lott*, *supra*, 51 Ohio St.3d at 171, 555 N.E.2d at 305.

**{¶ 65}** Fox also argues the court of appeals erred in commenting that "Fox purposely used deception to lure two young women into his control." We find no error even though Fox was not charged with any offense against Ritchey. The facts of the Ritchey incident were interwoven with the facts and circumstances of the Keckler kidnapping and murder. Moreover, the Ritchey offense was part of Fox's social history and background and reflected upon his character. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 612, 605 N.E.2d 916, 930; *State v. Cooey* (1989), 46 Ohio St.3d 20, 35, 544 N.E.2d 895, 914.

**{¶ 66}** We reject Fox's assertion that the trial court and the court of appeals improperly used Fox's strong family and religious background as nonstatutory aggravating circumstances. Instead, both courts simply explained why little weight was given to Fox's mitigation evidence. The weight, if any, to be given mitigation evidence is a matter for the discretion of the sentencer. *State v. Steffen*, *supra*; *State v. Stumpf*, *supra*. "At times, we have assigned little or no weight to evidence of personality disorders or family background; hence, the trial court did not err when declining to give those factors any weight." *State v. Richey*, *supra*, 64 Ohio St.3d at 370, 595 N.E.2d at 929. See, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 64, 549 N.E.2d 491, 505.

III

INDEPENDENT REASSESSMENT

{¶ 67} In his fourth proposition of law, Fox argues that, after independent reassessment, we should find the death sentence inappropriate and disproportionate and remand for the imposition of a life sentence. Fox argues that the evidence of kidnapping, or of violence in the kidnapping, is weak and circumstantial; hence, that aggravating circumstance is entitled to minimal weight when weighed against substantial mitigating factors.

{¶ 68} However, kidnapping can be by deception, R.C. 2905.01, and we find the evidence proved this aggravating circumstance beyond a reasonable doubt. Simply because the kidnapping involved deception rather than force offers scant reason to minimize this aggravating circumstance. The evidence showed that Fox secured Keckler's phone number and then called her pretending to be a prospective employer. Keckler expressed enthusiasm for her new "job" to her mother, girlfriend and boyfriend. These facts demonstrate Fox's careful planning of his "job interview" with Keckler. Additionally, Keckler's body revealed other signs of struggle; her face was bruised, and her clothing was disarranged.

{¶ 69} We find nothing in the circumstances of the offense to be mitigating. Under any reasonable interpretation of the evidence, Fox lured Keckler by careful deception into a situation where he could control or dominate her for his own gratification. For whatever reason, he then brutally stabbed and strangled her and callously dumped her body in a ditch.

{¶ 70} In contrast, Fox's history, character, and background do present unusual mitigating features. Numerous witnesses attested to Fox's good character and favorable community reputation. Additionally, Fox's steady, honest employment since high school graduation is relatively unusual among those persons convicted of aggravated murder and sentenced to death. Thus, Fox's history, character and background are entitled to weight in mitigation.

**{¶ 71}** Fox also lacks any prior criminal record; he thus has the benefit of that statutory mitigating factor in R.C. 2929.04(B)(5). Additionally, the support of Fox's family and friends, his love and care of his daughter, his remorse, and his relatively successful adjustment to pretrial confinement in the county jail can all be considered as favorable "other factors" under R.C. 2929.04(B)(7). Fox's personality disorder is also a mitigating "other factor." All of these factors are entitled to some weight.

**{¶ 72}** However, the foregoing exhausts Fox's mitigating factors. Even if Keckler called Fox a name, she did not thereby "induce" or "facilitate" the offense within the meaning of R.C. 2929.04(B)(1). Nor was Fox acting "under duress, coercion, or strong provocation" when he reacted to that name. See *State v. Seiber*, *supra*, 56 Ohio St.3d at 8, 564 N.E.2d at 415; *State v. Clark* (1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844, 856; R.C. 2929.04(B)(2). As discussed previously, Fox's personality disorder did not qualify as a "mental disease or defect" under R.C. 2929.04(B)(3). At thirty-three years of age, and as the principal offender, Fox did not meet the mitigating factors in R.C. 2929.04(B)(4) or (B)(6). Although Fox confessed, he did so only after initially denying any involvement, and his confession is entitled to no weight. Aside from those mentioned earlier, there are no other mitigating factors.

**{¶ 73}** When the aggravating circumstance is weighed against the mitigating factors, we find the aggravating circumstance of kidnapping outweighs the mitigating factors beyond a reasonable doubt. Although Fox kidnapped Keckler by deception, rather than force, considerable effort and planning apparently went into that kidnapping. Fox lured a vulnerable eighteen-year-old girl to a remote country road. When she rejected his advances, Fox brutally stabbed her. Then he deliberately got a rope out of the trunk and strangled her "just to make sure she was dead." After doing this, he dumped her body in a drainage ditch and drove home.

{¶ 74} Although Fox's steady employment, favorable character testimony, and lack of a prior criminal record are noteworthy, we accord them only modest weight in light of all the other circumstances. Fox faced few challenges and little adversity in his life compared with many others. Although Fox's mental disorder may be a mitigating "other factor," such a disorder tends to undercut any prospect of successful rehabilitation. Thus, the aggravating circumstance outweighs mitigating factors, even when the mitigating factors are considered in their entirety.

{¶ 75} The death penalty is appropriate, and that penalty is neither excessive nor disproportionate when compared with the penalty imposed in similar cases of aggravated murder during a kidnapping. See *State v. Seiber*, *supra*; *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464; *State v. Brewer*, *supra*; *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267.

{¶ 76} For the foregoing reasons, appellant's convictions and sentence are affirmed.

*Judgment affirmed.*

DOUGLAS, BETTMAN, F.E. SWEENEY and PFEIFER, JJ., concur.

A.W. SWEENEY and WRIGHT, JJ., concur in part and dissent in part.

MARIANNA BROWN BETTMAN, J., of the First Appellate District, sitting for RESNICK, J.

_____

**WRIGHT, J., concurring in part and dissenting in part.**

{¶ 77} I would affirm appellant's conviction but respectfully dissent as to the majority's affirmance of appellant's death sentence.

{¶ 78} I agree with the views of Judge James R. Sherck of the Court of Appeals for Wood County, whose separate opinion in the case below reads as follows:

{¶ 79} "In reviewing the penalty phase of the trial, I believe the trial court improperly considered certain evidence as an aggravating circumstance and failed

to articulate, pursuant to the requirements of R.C. 2929.03(F), why the aggravating circumstance is sufficient to outweigh the mitigating factors.

"I.

{¶ 80} "R.C. 2929.03(F) provides that on imposition of a death sentence the court or the panel of three judges:

{¶ 81} "'*** shall state in a separate opinion its specific findings as to [statutory] mitigating factors, *** other mitigating factors, the aggravating circumstances the offender was found guilty of committing, *and the reasons why the aggravating circumstances* the offender was found guilty of committing were sufficient to *outweigh the mitigating factors*. ***' (Emphasis added.)

{¶ 82} "In the instant case the panel of judges prepared a separate opinion discussing the single aggravating circumstance found and the mitigating factors presented by appellant. In the portion of its opinion entitled 'Why the Aggravating Circumstance is Sufficient to Outweigh The Mitigating Factors' the court summarily concluded that upon consideration of the evidence, '*** the aggravating circumstance sufficiently outweighed the mitigating factors presented in this case.'[1] It is clear to me that such an entry fails to satisfy the statutory requirement of R.C. 2929.03(F).

{¶ 83} "The purpose of the statutory requirement that a trial court and reviewing courts articulate the mental processes by which the decision to impose the death penalty was made is that this procedure provides a final opportunity for the decision maker and reviewing courts to expunge their reasoning of inappropriate matters. See R.C. 2929.05. For example, a sentence predicated on

---

1. Reproduced in its entirety this section [of the trial court's opinion] is as follows:

"'Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, the statement of the offender, arguments of counsel, and the mental report submitted pursuant to R.C. 2929.03(D)(1), the panel found, by proof beyond a reasonable doubt, that the aggravating circumstance sufficiently outweighed the mitigating factors present in this case. The panel, in compliance with R.C. 2929.03(D)(3) and after full deliberations, unanimously imposed the death sentence.'"

an aggravating circumstance that the murder was outrageously or wantonly vile, horrible, or inhuman is overbroad, because it does not sufficiently distinguish a case from others where death sentences were not imposed. *Godfrey v. Georgia* (1980), 446 U.S. 420 [64 L.Ed.2d 398, 100 S.Ct. 1759]. The logic being that, '\*\*\* a person of ordinary sensibility could fairly conclude that virtually every murder is outrageously or wantonly vile, horrible, or inhuman.' *State v. Maurer* (1984), 15 Ohio St.3d 239, 242 [15 OBR 379, 382, 473 N.E.2d 768, 775]. Even the reasoning of seasoned jurists may lapse to the arbitrary or capricious when faced with a senseless killing. This is the reason capital sentencing schemes must be designed to channel the discretion of the sentencing body. See *Zant v. Stephens* (1983), 462 U.S. 862, 874-878 [103 S.Ct. 2733, 2741-2743, 77 L.Ed.2d 235, 248-251]; *Wainright v. Goode* (1983), 464 U.S. 78, 87 [104 S.Ct. 378, 383, 78 L.Ed.2d 187, 194].

{¶ 84} "The gravity and the finality of the death penalty commands that at each juncture the decision making process be examined and reexamined to assure that this sanction is not imposed arbitrarily or disproportionately. For this reason, sentencing statutes which provide for a balance of clear and concrete aggravating and mitigating factors and incorporate meaningful appellate review are favored. *State v. Maurer*, *supra* [15 Ohio St.3d] at 246 [15 OBR at 385, 473 N.E.2d at 777-778], citing *Gregg v. Georgia* (1976), 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] and *Profitt v. Florida* (1976), 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913]. The requirements of R.C. 2929.03(F) that a court or panel explain its reasoning is an integral part of a meaningful review.

{¶ 85} "The Ohio Supreme Court has examined the question of a trial court's omission of an R.C. 2929.03(F) explanation in *State v. Maurer*, *supra*, and found in that case that the error was harmless. The court reasoned that the statutorily mandated independent review of capital sentencing by both the court of appeals and by the [S]upreme [C]ourt provides, in certain circumstances, a

sufficient substitute for the sentencing court's explanation so that an appellant need not be prejudiced. It is critical to the instant case to note, however, that the *Maurer* court specifically limited its holding on this issue to the facts of that case. Indeed the *Maurer* court accompanied its holding with a strong caveat:

"'*** we do not intend to trivialize the duty of the trial court under R.C. 2929.03(F) to articulate its reasoning or to suggest that such an omission is insignificant. It is not. The failure of a trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances. In a closer case, those perceptions could make a difference in the manner in which a defendant pursues his appeal and in which a reviewing court makes its determination.' *Maurer* [*supra*, 15 Ohio St.3d], at 247 [15 OBR at 386, 473 N.E.2d at 778].

{¶ 86} "For two reasons, I believe the instant appeal is that 'closer case' to which the Maurer court referred. First, I believe that, although there are many similarities between appellant's crime and that of Maurer, the two cases are factually distinguishable. Maurer confessed to and was convicted of the kidnap, sexual assault and murder of a seven year old girl. In his confession Maurer stated that he picked up his victim at her school and drove her to a secluded area. After stopping the car, Maurer and his victim went into a woods. Maurer took a shot gun with him. Once in the woods Maurer attempted to sexually molest the girl, shot her to death, then secreted the body.

{¶ 87} "Maurer was indicted, tried, and convicted of aggravated murder with an R.C. 2929.04(A)(7) specification, kidnapping, and gross sexual imposition. During the sentencing phase Maurer presented for mitigation evidence that he was of low intelligence, an alcoholic, and possessed a borderline personality disorder. He was a high school drop out discharged for bad conduct from the U.S. Marine Corp[s]. Friends testified that when he drank he became loud, boisterous and likely

to start fights. He had twice completed programs for alcoholism. While Maurer did not have a lengthy criminal record, he had served a short term of imprisonment for grand theft. He was on probation at the time of his offense.

{¶ 88} "Maurer's jury recommended the death penalty. The trial court, as discussed above, concluded the aggravating circumstance of which Maurer was convicted outweighed mitigating factors, adopted the jury's recommendation, and sentenced Maurer to death. The Ohio Supreme Court, in its independent review, concluded that, while Maurer did not have a lengthy prior criminal record, he was on probation for a previous criminal conviction at the time of his offense and thus gave no weight to an R.C. 2929.04(B)(5) mitigating factor. The Ohio Supreme Court also concluded that Maurer's alcoholism and other problems were no different than the problems encountered by many others who were not criminals, let alone murderers. The court thus found no mitigating circumstances.

{¶ 89} "The unique circumstances of Richard Fox are well discussed in the majority opinion. My own weighing of the aggravating and mitigating elements of this case appears in Part III. For this section, it is sufficient to note that until one reaches the conclusory portion of the majority's independent evaluation, Richard Fox appears to be a good father and an asset to his community. If we are to credit the testimony of the psychiatric experts, Fox's act of violence seems to be the result of an undetected and untreated personality disorder, the cumulative dimension of which led to the death of Leslie Keckler. This is a far closer call than *Maurer*. This is exactly the type of case alluded to by the *Maurer* caveat.

"II.

{¶ 90} "Exacerbating my concern for the trial panel's failure to articulate its reasoning are comments contained in the body of the trial panel's opinion. From the language contained therein, it appears that the trial panel utilized inappropriate factors to negate mitigation.

{¶ 91} "At the conclusion of the trial panel's discussion of appellant's mitigating factors appears a summary paragraph which recites the conclusion that the panel afforded due consideration of appellant's personality traits as formed by his family life. The panel states it considered his education, his religious and other experiences, as well as his personality disorders. The final sentence of the paragraph states:

"'The panel also took note of the manner in which he planned and executed the events that eventually led to the kidnapping and violent murder of the victim.'

{¶ 92} "From the quoted sentence above, an inference can be drawn that the panel has gone outside the sentencing statute to create a judge-made aggravating factor which the panel then uses to counterbalance all of the mitigating evidence submitted; that factor being the 'violent' murder. Once this factor is used to negate mitigation, then the uncountered weight of the aggravating circumstance of which appellant was convicted prevails. This is inappropriate. R.C. 2929.03(D)(2) permits the panel to weigh only the aggravating factor for which the appellant was tried and convicted. The panel may not select and consider other aggravating factors which were not included in the indictment and verdict. Additionally, such an amorphous, semi-articulated extra-statutory aggravating factor is surely less concrete than the 'vile, horrible or inhuman circumstance' found overbroad in *Godfrey v. Georgia*, *supra*, or the 'depravity of mind' or 'especially heinous, atrocious, or cruel' found to be unconstitutionally vague. *Deutsher v. Whitley* (C.A.9, 1991), 946 F.2d 1443, 1446-1447; *Maynard v. Cartwright* (1988), 486 U.S. 356, 359 [108 S.Ct. 1853, 1857, 100 L.Ed.2d 372, 379].

{¶ 93} "Additionally, it is also inappropriate for the trial panel to consider appellant's 'plann[ing].'  The psychiatric testimony clearly showed that appellant planned his attempt to deceive the victim, but that he had not planned to commit a murder.  In any case, appellant's planning was not the aggravating circumstance of which he was convicted.  R.C. 2929.04[B][7], the aggravating circumstance of which appellant was convicted, is stated in the alternative.  The murder is aggravated when it is committed during the course of a kidnapping and the offender was the principal offender in the commission of the aggravated murder, *or* when the murder was committed with prior calculation and design.  [Emphasis *sic*.] Appellant was indicted and convicted of being a principal offender, not of committing murder with prior calculation and design.

{¶ 94} "From the language of the trial panel's opinion there appears to be a likelihood that the panel misapplied the statutory balancing of aggravating circumstance and mitigating factors.  Unfortunately, we do not know if this was the case because the trial panel erred by failing to articulate its reasoning pursuant to R.C. 2929.03(F).

{¶ 95} "Unlike *State v. Maurer*, *supra*, the weighing of Richard Fox's aggravating circumstance against his mitigating factors appears to be a close call. As such, I believe the trial court's error to be prejudicial to him.  On this issue alone I believe a remand for new sentencing proceedings is in order.  [Footnote omitted.]

"III.

{¶ 96} "In addition to the legal concerns expressed above, I have, as required by R.C. 2929.05, conducted my own examination of the facts of the case to determine whether the sole aggravating circumstance outweighs the mitigating factors.  In so doing, I cannot conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 97} "Unlike the trial court, I do not feel that virtue is its own reward.  The trial court held that appellant's previous good deeds and community involvement

were entitled to little weight in mitigation. I, on the other hand, find a previous life of providing benefit to the community to be worthy of extraordinary consideration. Criminal penalties are not imposed privately, but as a function of society. Government has the right to govern, and to mete out criminal penalties, by the consent of the governed. In this case, the trial court held that appellant's assistance in community events was a factor which should have 'allowed him to be able to follow the laws of our society.' The trial panel then accorded little weight in mitigation to this factor. Are we to presume that the trial panel would have more seriously considered mercy if appellant had voluntarily been a burden to society all of his life?

{¶ 98} "The trial panel gave little account to the testimony regarding appellant's personality disorder. The judgment of the panel describes this condition more like a character flaw than a medical condition. Contrary to the conclusion of the trial panel, the testimony does *not* show that appellant merely had an excessive sense of self-worth. The testimony showed, instead, that appellant suffered from a debilitating inability to live with his own lack of self-worth and that he compensated by fantasizing himself as a quite special person—one of great importance. Dr. Sherman testified that appellant was so horrified by his own lack of worth that he created a fantasy so extreme that he could avoid recognizing reality. Appellant lacked the usual defense mechanisms that the mentally healthy enjoy.

{¶ 99} "In my view, the evidence clearly established that appellant suffered from a personality disorder that altered his perception of reality and led directly to the commission of this murder. I agree with the majority and the trial court that this condition is not within the scope of R.C. 2929.04(B)(3) despite the testimony that appellant was 'unable' to control his rage. However, I consider it to be of substantial weight as an 'other' mitigating factor under R.C. 2929.04(B)(7).

{¶ 100} "The record in this case convinces me of additional substantial mitigating factors. For instance, there was testimony that appellant had a positive

impact on the life and development of his daughter, Jessica, even while he was in jail awaiting trial. Witnesses, including family members and a minister (appellant's future brother-in-law, Jerry Wiles), opined that appellant would continue to be a positive force in Jessica's life. This innocent child has already suffered the death of her mother and the imprisonment of her father. She is likely to have a difficult life. Appellant's death cannot bring back Leslie Keckler. But, appellant's death at the hands of the state most assuredly will have a negative impact on the child, Jessica. I find that future benefits that appellant's life may present to her by way of lessening the effects of the past and perhaps improving the future to be a mitigating factor.

{¶ 101} "I find that the evidence establishes yet another mitigating factor not discussed by the majority or the trial panel. Three sheriff's deputies testified that appellant was a fine inmate and 'a good man.' The mere fact that an inmate convicted of a capital offense is able to obtain the favorable testimony of his jailors is in itself unusual. The testimony of the deputies was supplemented by the opinion of Jerry Wiles, who anticipated that appellant not only would continue to be a cooperative inmate, but that he would ultimately be a useful force within the prison community. Wiles formed this opinion while ministering to appellant in the county jail. If 'mitigating' is broadly defined as reasons not to take a life, then the potential for having a more tranquil influence on the prison community is mitigating.

{¶ 102} "Because of the legal errors made during the punishment phase of the trial and for reason of my own independent evaluation of the aggravating circumstance and mitigating factors, I would vacate appellant's sentence of death and remand to the trial court for purpose of imposing life imprisonment pursuant to R.C. 2929.05."

A.W. SWEENEY, J., concurs in the foregoing opinion.

———————————