OPINIONS OF THE SUPREME COURT OF OHIO

**** SUBJECT TO FURTHER EDITING ****

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Simko, Appellant.
[Cite as State v. Simko (1994),     Ohio St.3d     .]
Criminal law -- Death penalty upheld, when.
    (No. 93-569 -- Submitted November 30, 1994 -- Decided December 30, 1994.)
    Appeal from the Court of Appeals for Lorain County, No. 91CA005214.
    Defendant-appellant, John Simko, Jr., was convicted by a three-judge panel of the kidnapping and aggravated murder of his ex-girlfriend, Mary Jane Johnson, and the kidnapping of her coworker, Harold "Buddy" Baker. The crimes were committed the morning of August 7, 1990, at the Lorain Durling Elementary School where the victims worked. The following events led to this tragedy.
    Appellant and Mary Jane Johnson had had an on-again-off-again relationship for approximately five to seven years. At the time of the shooting, the couple had been apart for about one to four weeks.
    On August 2, 1990, appellant entered the Magnum-Fire Gun Shop in Lorain, Ohio and expressed an interest in purchasing a .357 Magnum Smith & Wesson revolver. On August 3, 1990, he returned to the store and bought the gun and a box of ammunition. That same day, appellant went to his cousin Larry Simko's house to learn how to use the weapon.
    Three days later, on August 6, around 10:30 p.m., Johnson and her best friend and neighbor, Mary Hembree, were sitting on Johnson's porch drinking coffee. They saw appellant walk by the house. He appeared to be intoxicated. After Johnson expressed fear at seeing appellant, the women decided to finish their coffee at Hembree's house. Before going to Hembree's, however, they watched appellant walk past Hembree's house. They then entered Hembree's car and drove around to determine if appellant's car was parked nearby. From the car they saw appellant on an adjacent street, behind Johnson's house.
    Not finding appellant's car, they drove to Hembree's

house.  When they arrived there, they observed appellant driving stop-and-go through the neighborhood in his car. Johnson ran into Hembree's house and again expressed fear. Because Johnson was unwilling to do so, Hembree called the sheriff's department to report appellant.

Several hours later, at approximately 1:00 a.m., on August 7, appellant went to his son James Simko's house.  Appellant woke him up and had him drive to Tiny's Bar.

At the bar, appellant had a few more drinks.  Appellant told his son that he was going to shoot himself and Johnson and that he wanted to prepare a will.  Appellant wrote on a piece of paper, "I leave Jim my TV 2 VCRs a chair, & boat air compressor battery charger, tools, & whatever I own." Appellant signed his name and then had a patron of the bar witness his signature.  In addition, appellant wrote a check to James Simko to exhaust the balance of his bank account.  The men stayed at the bar until it closed.

After leaving the bar, James Simko drove his father home. They stayed there for approximately ten to twenty minutes.  At about 3:00 a.m., since he had to be at work by 6:00 a.m., appellant asked James to drive him to Lorain Clearview High School, where he worked as a custodian.  At the school, appellant grabbed a bottle of whiskey and made some coffee, which James drank.  Appellant had one or two shots of whiskey and a coke.

At around 4:00 a.m., when James was out of the room, appellant called his cousin, Larry Simko.  Appellant asked Larry to hide his (appellant's) boat and told him that he was "going to shoot two people."  Although Larry testified he did not take appellant's threat seriously because he thought appellant was drunk, Larry admittedly dressed and went looking for appellant.

James Simko stayed with his father until 5:50 a.m. when he dropped him off at nearby Durling Elementary School where Johnson worked as a cleaner.  James did not think his father was drunk, just "hung over."  Although James did not take his father's threat seriously, he admittedly drove by the school three times that morning.

At around 6:00 a.m., Harold Baker, a fellow custodian, arrived for work at Durling.  He saw appellant walking toward him.  Baker thought appellant might have been drinking, but he did not think he was drunk.  Upon appellant's request to "have five minutes" with Johnson, Baker unlocked the school and appellant accompanied him to the teachers' lounge.  Baker did not notice whether appellant had a gun.

When Johnson arrived for work, soon after 6:00 a.m., Baker met her at the front of the building, and told her of appellant's request.  Johnson went to the teachers' lounge. Upon hearing Johnson scream his name, Baker ran to the lounge, unlocked the door and saw appellant with his left arm around Johnson and a gun in his right hand.  Johnson was crying, and appeared to be scared and nervous.  Appellant yelled at Baker to "get the hell out," but when Baker attempted to exit the lounge to the hallway, appellant said, "No, not there," and instead directed Baker to go into the restroom located in the lounge.

Once in the restroom, Baker locked the door and after

removing the screen, escaped through the window.  Baker then drove his truck to the nearby bus garage to find someone to call the police.  While the police were being summoned, Baker saw a student being dropped off at school.  Baker jumped in his truck to stop the boy from entering the school.

When Baker arrived back at the school, he saw the youth starting down the hall.  Baker apprised him of the situation.  As the two were starting to leave, Baker saw appellant shoot himself in the foot, as he stood in the doorway of the lounge.

Baker and the boy left the school.  Once they were outside, Larry Simko approached Baker and asked him if he had seen appellant.  Baker told him what was happening.  Larry entered the school and shouted out to appellant.  After hearing two shots, the men decided to leave.  Back at the bus garage, the men then heard two more shots around 6:40 a.m.

It was later determined that the first two shots had been fired at the lounge's door lock, and the second two shots had been fired at Johnson.

Sometime later, around 8:30 a.m., the rescue squad came and took Johnson to the hospital.

Upon her arrival at the hospital, Johnson was alert and oriented.  Just before surgery, Johnson was interviewed by Detective Bruce Johnston of the Lorain County Sheriff's Department.  Although Johnson was unable to talk because she was intubated, she nodded her head in response to the detective's questions.  Detective Johnston testified that Johnson nodded affirmatively when asked if appellant had told her he was going to kill her and kill himself, and if she had attempted to run from the appellant.  Johnson also nodded yes to whether appellant shot her twice and then fled from the school building.  Despite efforts to save her, Johnson died one day later from injuries caused by the gunshot wounds.

Police found appellant walking in the area and arrested him.  Expert testimony indicated that appellant's blood alcohol level at the time of the shooting would have been about .14 percent.

On August 14, 1990, appellant was indicted for two counts of kidnapping and one count of aggravated murder with a felony-murder specification alleging kidnapping and a firearm specification.  The three-judge panel convicted appellant as charged.

Appellant called several family members, coworkers, and a clinical forensic psychologist during the sentencing hearing.  Most family members acknowledged that appellant had a drinking problem.  Some said that when drunk he was more likely to be aggressive and mean.  All the family members and coworkers related specific instances where appellant had been thoughtful and caring.  These included the care of his elderly and arthritic mother, who witnesses testified was a demanding and difficult person.  In addition, appellant's stepson told how appellant had supported his ex-wife, both emotionally and financially, while she was dying of cancer.  The stepson also detailed the help appellant had provided to him, a paraplegic.  A coworker testified to appellant's strong work ethic and the work he did overseeing troubled youth in a work study program at the school.

Appellant's family was neither close nor loving.  Although

appellant's brother testified that appellant's upbringing had been fairly normal, another family member testified that appellant's father had been an alcoholic. Appellant's former sister-in-law testified that appellant's father had been a cruel man and a "demonic person" when he drank.

Family members and coworkers agreed that although appellant was likable, he was also reserved and uncomfortable around people. Although appellant quit school in the tenth grade, he received a high school equivalency diploma while in the service. Appellant did not attend college like his siblings. Instead, he successfully served eight years in the air force.

Dr. James Brown diagnosed appellant as suffering from "avoidant personality disorder" ("APD"), as well as a history of alcohol dependency. Dr. Brown stated that the symptoms of APD include pervasive social anxiety, a fear of rejection, and a hypersensitivity to the reactions of others. He testified that alcohol disinhibits feelings of anger, and renders a person like appellant more prone to violence.

Despite this disorder, Dr. Brown testified, appellant was able to form a close, loving relationship with Johnson, which was unique in his life. When this relationship was threatened, appellant reacted in an uncharacteristic manner. Dr. Brown believed that APD together with the alcoholism contributed to Johnson's death.

Sergeant Thomas Tomasheski of the Lorain County Sheriff's Department testified that appellant had no prior convictions or criminal record. Corrections Officer Robert Vansant testified that appellant had adjusted to incarceration and was not a discipline problem.

Finally, appellant gave a brief unsworn statement indicating his remorse.

In rebuttal, the state presented James Simko, who testified that he had seen his father assault his mother "quite a few times," and that this was what led to their divorce. After this testimony, in an attempt to impeach his credibility, the defense questioned James about his own record of domestic violence and his drug problems. The defense also questioned James about the approximately $16,600 he had received from appellant's retirement fund which was now missing.

After considering this mitigation evidence, the panel sentenced appellant to death. For the firearm specification and the remaining offenses, appellant was sentenced in accordance with law. The court of appeals affirmed the convictions and sentences, including the sentence of death.

The cause is now before this court upon an appeal as of right.

David H. Bodiker, Ohio Public Defender, Kathleen A. McGarry and Linda E. Prucha, Assistant Public Defenders, for appellant.

Gregory A. White, Lorain County Prosecuting Attorney, and Jonathan E. Rosenbaum, Assistant Prosecuting Attorney, for appellee.

Francis E. Sweeney, Sr., J.  Beginning in State v. Poindexter (1988), 36 Ohio St.3d 1, 3, 520 N.E.2d 568, 570, and

recently reiterated in State v. Scudder (1994),    Ohio
St.3d   ,    N.E.2d   , we expressed the view that when we
review death penalty cases, our obligation under the law does
not require us to address all propositions of law in opinion
form.  We adhere to this view today, and therefore summarily
dispose of many propositions of law where either the error was
not properly preserved or the propositions have been decided
adversely to the appellant.  In doing so, we hasten to add that
although this opinion does not separately address each of the
twenty-one propositions of law (see Appendix), we have fully
reviewed the record and passed upon each one prior to reaching
our decision.  In addition, we independently assessed the
evidence relating to the death sentence, balanced the
aggravating circumstance against the mitigating factors, and
reviewed the proportionality of the sentence to sentences
imposed in similar cases.  As a result, we affirm the
convictions and sentence, including the death penalty.

I
GUILT PHASE
Sufficiency of Evidence

In Proposition of Law I, appellant challenges the
sufficiency of the evidence for the capital specification and
for the separate kidnapping offense charged in count two.[1]

The capital specification appellant was convicted of was
kidnapping:  "committing, attempting to commit, or fleeing
immediately after committing or attempting to commit
kidnapping."  R.C. 2929.04(A)(7).  Appellant was also convicted
of the separate offense of kidnapping Johnson.  R.C. 2905.01,
as charged in this case, involves the removing of a person by
force, threat, or deception from the place where she is found,
or restraining her of her liberty, to terrorize or inflict
serious harm on the victim.  R.C. 2905.01(A)(3).

Appellant argues that under this court's decision in State
v. Logan (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d
1345, the state failed to present sufficient evidence of either
the elements of kidnapping or a separate animus from the animus
to commit aggravated murder to sustain his convictions on these
charges.  Appellant asserts that the alleged kidnapping of
Johnson was incidental to the murder, as in State v. Jenkins
(1984), 15 Ohio St.3d 164, 198, 15 OBR 311, 340, 473 N.E.2d
264, 295 (no kidnapping where restraint was in a public bank
and incidental to robbery).

In Logan, supra, this court held that where the murder is
the underlying crime, "a kidnapping in facilitation thereof
would generally constitute a separately cognizable offense."
Id. at 135, 14 O.O.3d at 379, 397 N.E.2d at 1352.  However, the
test to determine whether the kidnapping was committed with a
separate animus and thus amounts to a separate offense is
"whether the restraint or movement of the victim is merely
incidental to a separate underlying crime, or instead, whether
it has a significance independent of the other offense."  Id.
at 135, 14 O.O.3d at 378, 397 N.E.2d at 1351.

In State v. Seiber (1990), 56 Ohio St.3d 4, 14, 564 N.E.2d
408, 420, we found kidnapping where bar patrons were repeatedly
ordered to lie on the floor while defendant and his accomplice
had drawn guns.  When another bystander refused to comply with
the demands, he was shot and killed.  Under these

circumstances, this court held that it was reasonable for a jury to conclude that Seiber had restrained that victim of his liberty and that this evidence was sufficient to support the kidnapping charge and specification.

Clearly, the instant facts present a more compelling case of kidnapping than even Seiber. According to Harold Baker's testimony, Johnson was restrained and terrorized by the armed appellant for approximately one-half hour. Further evidence indicated that Johnson managed to escape from appellant, but appellant shot her twice in the back while she was fleeing down the school hallway. Thus, contrary to appellant's assertion, the evidence and testimony indicate that Johnson's kidnapping was completed prior to the murder, and appellant did not murder Johnson until she fled from him. Therefore, the prosecution presented sufficient evidence to prove not only kidnapping, but also an animus for kidnapping separate from the aggravated murder. We reject this proposition of law.

In Proposition of Law VIII, appellant argues that the state failed to introduce evidence sufficient to convict him of kidnapping Harold Baker. Appellant contends that "any movement of Harold Baker was incidental to the murder of Mary Jane Johnson."

This proposition of law is also without merit. A review of the evidence reveals that it was sufficient to support appellant's conviction for kidnapping Baker.

Baker testified that when he encountered appellant in the teachers' lounge, appellant had a gun in one hand and an arm around Johnson. When Baker attempted to help Johnson, appellant told him to "get the hell out of here." When Baker reached for the door leading out to the hallway, appellant told him "No, not there" and motioned with the gun for Baker to go into the teachers' lounge restroom. After removing the screen from the window, Baker managed to escape. This testimony clearly indicated that Baker was restrained of his liberty to exit the teacher's lounge and was forced by appellant to enter the lounge restroom which had no outside exit. Moreover, Baker testified he was "scared" because appellant had a gun, thus demonstrating appellant's terrorizing of Baker (and inferentially Johnson). We reject this proposition of law.

Hearsay

In Proposition of Law VI, appellant argues that the trial court improperly admitted prejudicial hearsay testimony that did not qualify as an exception under either Evid.R. 804(B)(2)--dying declaration, or Evid.R. 803(2)--excited utterance.

The testimony was elicited from Detective Bruce Johnston of the Lorain County Sheriff's Department. Defense counsel challenged Detective Johnston's testimony on the grounds that the dying declaration exception did not apply since the victim had no reason to believe she was dying at the time Detective Johnston questioned her. In response, the prosecution claimed that it was relying not only on the dying declaration exception, but also on the excited utterance exception applied in State v, Huertas (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, 1068. The trial court then permitted the detective's testimony. The prosecution now concedes that the declaration does not qualify as a dying declaration under Evid.R.

804(B)(2). However, the state asserts it is admissible under the excited utterance exception.

In Huertas, id. at 31, 553 N.E.2d at 1068, this court, quoting paragraph two of the syllabus in Potter v. Baker (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, set forth the standard for the excited utterance exception: "To be admissible under Evid.R. 803(2) as an excited utterance, a statement must concern 'some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties. * * *'"

The testimony in issue consisted of Detective Johnston's questions to the victim, who was unable to speak because she was intubated. The detective testified that the victim nodded her head in response to specific questions posed to her. When asked if appellant had told her that he was going to kill her and kill himself, the victim nodded affirmatively. The victim also nodded yes as to whether she had attempted to run from appellant, and whether appellant had shot her twice and then fled the school building.

Appellant asserts that Huertas is not on point because there the declarant made oral statements, but here the victim only nodded in response to words of the detective. In addition, appellant points to paragraph two of the syllabus in State v. Wallace (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, where this court held: "The admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties."

A review of Huertas and Wallace justifies the admission of the testimony as an excited utterance. Given that the victim was unable to speak because of the intubation in her throat, the questions posed to her by the detective could certainly be characterized as leading under the syllabus in Wallace, supra. However, the questioning by the detective does not appear to be coercive, and the victim could have readily shook her head "no" to any of the questions, since the detective described her as being "alert" and "aware of what was going on." Therefore, appellant's sixth proposition of law is overruled.

In Proposition of Law XII, appellant contends that the testimony of Mary Hembree and Cheryl Hutchison contained irrelevant and prejudicial hearsay.

In the first instance, appellant characterizes as irrelevant the testimony of Hembree, the best friend of the deceased victim, who testified with respect to her activities with the victim on the night before the shooting. Appellant asserts that this testimony was not used by the state to show that appellant had harassed the victim, but rather to elicit testimony from Hembree that the victim had said she was "scared," which was clearly hearsay under Evid.R. 801(C).

The other instance of hearsay cited by appellant concerns the testimony of Cheryl Hutchison, the victim's daughter. In

response to the prosecutor's inquiry as to why the victim had changed her phone number, Hutchison testified that her mother had changed the number because appellant kept calling her mother after being told to stop. Defense counsel objected on hearsay grounds, but the trial court overruled the objection.

For Hembree's testimony, the prosecution cited Evid.R. 803(1) to support admission of the hearsay statements as statements of present sense impressions. In support of Hutchinson's testimony, the prosecutor referred to "present sense of mind," conflating the exceptions of Evid.R. 803(1) and (3). Evid.R. 803(1) permits admission of "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition * * *." The court of appeals found the testimony of Hembree to be properly admitted under Evid. R. 803(3), which permits "[a] statement of the declarant's then existing state of mind, emotion, [or] sensation * * *." In addition, the appellate court held that Hembree's testimony was "arguably relevant" to show that appellant was distraught and that he was following Mary Jane Johnson on the night before the shooting, showing prior calculation and design on the part of appellant.

The testimony of both witnesses is relevant, and its admission under Evid.R. 803(3) is supportable. Testimony similar to Hembree's was upheld in State v. Apanovitch (1987), 33 Ohio St.3d 19, 21-22, 514 N.E.2d 394, 398. (Testimony that the victim was fearful and apprehensive was not inadmissible hearsay and was properly admitted.)

Assuming, arguendo, that the testimony should not have been allowed, the other evidence in the case is still overwhelming. In addition, since this case was tried before a three-judge panel, it is presumed that the court considered only the relevant, material and competent evidence in arriving at its judgment, State v. Post (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759; State v. White (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 135, 239 N.E.2d 65, 70, and nothing in the record compels a contrary conclusion. Consequently, any error is harmless beyond a reasonable doubt. Accordingly, appellant's twelfth proposition of law is rejected.

Prejudicial Expert Testimony During Cross-examination

In Proposition of Law XIII, appellant contends that the trial court permitted inadmissible, prejudicial expert testimony during cross-examination. This testimony was elicited by the prosecution from appellant's expert witness, Dr. Robert Forney, a pathologist called to testify regarding appellant's blood alcohol level at the time of the murder.

During direct examination, Dr. Forney testified that based on tests he conducted upon appellant's blood sample taken after his arrest, appellant's blood alcohol level at the time of the shooting would have been .14 percent. On cross-examination, the state attempted to ask Dr. Forney whether a person with a blood alcohol level of .14 percent could form specific intent or purpose. Defense counsel objected and the prosecutor rephrased the question several times, which prompted further objections by appellant. Dr. Forney responded as follows to the prosecutor's question whether he understood the defense of intoxication: "[I]f intoxication is to such a degree as to prevent the formation of intent, that may be considered as a

mitigating circumstance by the Court."

When asked by the prosecutor, over defense objection, whether a person with a blood alcohol content of .14 percent would be so intoxicated as to prevent formation of intent, Dr. Forney responded, "No, they would not be so intoxicated." Upon defense counsel's request that the answer be stricken as too confusing on legal issues as to which Dr. Forney could not testify, the court replied:

"He's [Dr. Forney] talking about his belief and his field as a toxicological expert. * * * I'm not going to strike it. We will give it such weight as is appropriate.

"We are well aware of our responsibility to rule on issues of law."

Dr. Forney further testified that while appellant's blood alcohol level of .14 percent would affect his perception and judgment as well as be disinhibiting to him, "it would not go to the purpose of Mr. Simko on August 7th, 1990." Defense counsel's motion to strike this statement was overruled.

"Purpose" and "intent" are not arcane legal terms unfamiliar to nonlawyers. Thus Dr. Forney's testimony in this regard did not constitute a legal determination but was merely his professional opinion as to how a .14 percent blood alcohol level will affect a person's mind. This opinion meets the criteria of Evid.R. 702. Accordingly, appellant's thirteenth proposition of law should be overruled.

### Ineffective Assistance of Counsel

In Proposition of Law XVI, appellant claims he was deprived of the effective assistance of counsel throughout his trial. We have considered appellant's arguments, and find that he has failed to meet his burden of establishing ineffective assistance under the standards set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. We, therefore, reject this proposition of law.

## II
## PENALTY PHASE
### Appropriateness of Death Penalty

In his second proposition of law, appellant submits that the facts of this case do not warrant the sentence of death. Appellant argues that he presented substantial mitigating evidence, that he was found guilty of only one aggravated circumstance, and that the kidnapping was merely incidental to the aggravated murder. Appellant further argues that the court of appeals' review of the trial court's action in this respect was cursory, contrary to R.C. 2929.05, and unconstitutional.

First, with respect to appellant's assertion that the kidnapping of Mary Jane Johnson was merely incidental to the aggravated murder, this argument was explored and rejected under Proposition of Law I.

Second, a review of the trial court's separate opinion, required pursuant to R.C. 2929.03(F), indicates that the court thoroughly explored various possible mitigating factors including the history, character and background of appellant. The trial court gave "some weight" to appellant's lack of a prior criminal history, as well as appellant's work record, service record, adjustment to his incarceration, and his support and assistance of his family members. The court also considered appellant's remorse. Nevertheless, the three-judge

panel found that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. Similar to the trial court in State v. Stumpf (1987), 32 Ohio St.3d 95, 103, 512 N.E.2d 598, 607; and State v. Steffen (1987), 31 Ohio St.3d 111, 509 N.E.2d 383, the trial panel below properly discharged its duties under R.C. 2929.03(F).

The court of appeals' discussion of the mitigating factors was somewhat more than cursory, but not as thorough as the trial court's. In addition, the appellate court failed to state what weight, if any, it gave to any of the mitigating factors in favor of the appellant. Nevertheless, this court's independent weighing of the aggravating circumstance versus the mitigating factors and proportionality review will cure any error in this regard. State v. Clark (1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844, 856; State v. Evans (1992), 63 Ohio St.3d 231, at 253, 586 N.E.2d 1042, at 1059.

For these reasons, we reject Proposition of Law II.

Errors in Sentencing Opinion and Penalty Phase

In his third proposition of law, appellant contends that errors within the sentencing opinion of the trial court necessitate vacation of his capital sentence.

Appellant asserts that the trial court made findings that were inconsistent with the evidence presented at trial. Specifically, appellant contends there was no evidence of when or where the victim was shot. While it is true that the prosecution did not present an eyewitness blow-by-blow account of the victim's escape or the shooting by appellant, the physical and testimonial evidence was more than sufficient for the court to infer that appellant shot the victim as she escaped and ran down the school hallway.

Appellant next cites a misrepresentation of the record in the sentencing opinion's statement that the victim had indicated to appellant that she did not want to reestablish their relationship. The mistake was certainly harmless. Appellant then cites seven other instances in which the sentencing opinion allegedly misrepresented the record by failing to include evidence that could have been mitigating. However, as pointed out by the appellate court below, "while the panel was required to consider and weigh the nature of the circumstances of the offenses with the mitigating factors [Stumpf, supra], as trier of fact, it was not required to believe or consider relevant all evidence presented to it. Furthermore, the panel was not required to enumerate every piece of evidence presented in the record of this opinion."

While appellant asserts that, based on the language of the sentencing opinion, the court might not have found him guilty of the aggravating circumstance until the penalty phase, the filed verdicts show that the finding of guilt was properly made during the guilt phase. Likewise, appellant's argument concerning the trial court's reference to "circumstances" in the plural at several points in the opinion, rather than to the single aggravating circumstance, is similar to the argument rejected by this court in State v. Jells (1990), 53 Ohio St.3d 22, 33-34, 559 N.E.2d 464, 475-476.

Appellant also claims error in the sentencing opinion where the trial court found "that the Defendant has not established by a preponderance of the evidence sufficient

mitigating factors set forth in R.C. 2929.04(B) which prevent the aggravating circumstances from outweighing the mitigating factors beyond a reasonable doubt." Although appellant asserts that the trial court erroneously switched the burden of proof to him, appellant misreads the trial court's statement.

For all these reasons, Proposition of Law III is overruled.

In his fifth proposition of law, appellant argues that three egregious errors during the penalty phase compel vacation of his death sentence.

First, appellant seizes on a comment made by one member of the panel during a hearing prior to the penalty phase: "* * * I am not clear on a distinction between mitigating factors and exculpatory evidence * * *." Appellant also cites a statement by defense counsel that is inconsistent with State v. Holloway (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, paragraph one of the syllabus:

"I think mitigating evidence, Your Honor, has been defined that mitigating factors are factors that while they do not justify or excuse the crime, nevertheless in fairness and mercy may be considered by you as extenuating or reducing degree of the defendant's blame for punishment."

Appellant points out that counsel for the state also injected culpability into a definition of mitigation, and that this combination of errors mandates vacation of the death sentence.

While it is clear that mitigating factors "are not necessarily related to a defendant's culpability," Holloway, supra, paragraph one of the syllabus, the sentencing opinion indicates that the trial court considered all the proffered mitigating factors, not merely those related to appellant's culpability.

Appellant also contends under this proposition that the trial court erred in ordering a guilt-phase transcript. Defendant relies on State v. DePew (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, in arguing that under R.C. 2929.03(D)(3), the sentencing court may only consider the "relevant evidence raised at trial," and that admission of the transcript would permit the court to consider irrelevant and prejudicial evidence contained therein.

The instant cause was tried before a three-judge panel, and the admission of the transcript by the panel did not deprive appellant of a fair trial since the court may consider "the testimony" at trial. In addition, the presumption applies that the trial panel considered only the relevant, material and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary. Post, supra, 32 Ohio St.3d 380, 513 N.E.2d 754. Since it does not affirmatively appear that the trial panel considered irrelevant, immaterial or incompetent evidence, this argument is rejected.

Appellant also asserts that the trial court erred in allowing, over defense counsel's objection, improper rebuttal testimony from James Simko, appellant's son, that appellant hit his ex-wife. However, in its sentencing opinion, the panel stated that it did not find this testimony credible and did not rely on it. Accordingly, this proposition of law is meritless.

III
INDEPENDENT ASSESSMENT OF SENTENCE

Pursuant to our duties imposed by R.C. 2929.05(A), we now independently review the death penalty sentence for appropriateness and proportionality.

The evidence establishes beyond a reasonable doubt the aggravating circumstance that appellant killed Johnson during the commission of a kidnapping.

The nature and circumstances of the offense provide few mitigating features. Appellant and Johnson had an on-again-off-again relationship that was definitely off at the time of the offenses. Although appellant went on a drinking binge during the twelve or so hours prior to the shooting, evidence indicated that appellant was able to plan, move, and make himself understood on the morning of the shooting. The facts that appellant attempted to execute a will, emptied his bank account and told his son that he was going to kill himself and Johnson, that he declared to his cousin that he was going to shoot two people, that he purchased a gun and ammunition several days before and learned how to use the weapon, and that the night before the shooting appellant stalked Johnson all indicate that his crimes were not a sudden or provoked act of passion. Appellant held his victim at bay for approximately one-half hour, terrorizing her and kidnapping a coworker in order to prevent him from obtaining help for the victim. Five shots were fired from appellant's gun, two of which were directed at Johnson's back as she tried to escape from him. Afterwards, appellant fled and left her to die by the school dumpsters. Help for Johnson did not arrive until sometime later.

Appellant's history, character, and background do provide mitigating features. Appellant's father was a cruel man and an alcoholic. Evidence established that appellant, too, was alcohol dependent. His mother was possessive and demanding. However, appellant had several siblings, all of whom graduated from college. Appellant served eight years in the armed service and received an honorable discharge. Coworkers and family members found appellant helpful and likable.

With respect to the statutory mitigating factors, appellant's lack of a significant criminal history is entitled to some weight, R.C. 2929.04(B)(5). Stumpf, supra; State v. Brewer (1990), 48 Ohio St.3d 50, 64, 549 N.E.2d 491, 505. Under the "other factors" provision, R.C. 2929.04(B)(7), appellant's voluntary intoxication may be given some weight, see State v. Lawson (1992), 64 Ohio St.3d 336, 352, 595 N.E.2d 902, 914. However, under the circumstances of this case, intoxication is not accorded much weight, given the expert and eyewitness testimony of appellant's level of intoxication and behavior at the time of the murder. State v. Slagle (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916, 931. The avoidant personality disorder that appellant suffers from, as testified to by Dr. Brown, is entitled to some weight in mitigation. See State v. Davis (1992), 63 Ohio St.3d 44, 51, 584 N.E.2d 1192, 1198. However, this disorder does not qualify as a "mental disease or defect" under R.C. 2929.04(B)(3). See Seiber, supra, 56 Ohio St.3d at 9, 564 N.E.2d at 415. In addition, appellant's alcoholism does not qualify as a "mental disease or defect." See State v. Lewis (1993), 67 Ohio St.3d 200, 209, 16 N.E.2d 921, 928. Appellant's expression of remorse during his

unsworn statement should be accorded little if any weight given the history of his relationship with the victim. See Post, supra, 32 Ohio St.3d at 394, 513 N.E.2d at 768. Also, appellant's work record, service record, adjustment to incarceration, and assistance to his family members are entitled to some weight in mitigation. While appellant was under stress due to the breakup of his relationship with the victim, it cannot be characterized as coercion or strong provocation and is not entitled to any weight under R.C. 2929.04(B)(2). See State v. Bedford (1988), 39 Ohio St.3d 122, 133, 529 N.E.2d 913, 924. None of the other statutory mitigating factors appear relevant.

Upon weighing the aggravating circumstance against the mitigating factors, the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Appellant deliberately went to Johnson's place of employment armed with a weapon he purchased only a few days before the murder. When Johnson entered the teachers' lounge, appellant used the gun to restrain her of her liberty. Appellant held Johnson against her will and prevented her from leaving the lounge. In fact, appellant had the opportunity to release Johnson when Baker came to her aid. However, appellant chose to restrain Johnson and ordered Baker into the restroom. Later, Johnson managed to escape, and was shot twice in the back. This whole ordeal lasted approximately thirty minutes. Thus, the evidence proved a calculated, prolonged and unprovoked kidnapping in the course of which appellant purposely murdered Johnson.

The death penalty imposed in this case is both appropriate and proportionate when compared with similar capital cases. While the circumstances of the instant murder do not contain the brutality present in felony murder cases involving kidnapping such as State v. Buell (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; State v. Cooey (1989), 46 Ohio St.3d 20, 544 N.E.2d 895; or State v. Spirko (1991), 59 Ohio St.3d 1, 570 N.E.2d 229; the penalty is justifiable when compared to the sentence imposed in State v. Brewer (1990), 48 Ohio St.3d 50, 549 N.E.2d 491; State v. Seiber, supra, 56 Ohio St.3d 4, 564 N.E.2d 408; and State v. Fox (1994), 69 Ohio St.3d 183, 631 N.E.2d 124.

Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

A.W. Sweeney, Douglas and Resnick, JJ., concur.

Moyer, C.J., Wright and Pfeifer, JJ., dissent.

Footnote:
1    At trial, defense counsel conceded that appellant had killed Johnson.

APPENDIX

"Proposition of Law No. I[:]  Where the state fails to introduce sufficient evidence to prove a capital specification of kidnapping beyond a reasonable doubt, a defendant is deprived of his right to due process of law under the Fourteenth Amendment to the United States Constitution, and Section 16, Article I of the Ohio Constitution.

"Proposition of Law No. II[:]  The death sentence imposed in appellant Simko's case was inappropriate, in violation of the Fifth, Eighth and Fourteenth Amendments to the United

States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

"Proposition of Law No. III[:] Errors in the opinion of trial court, filed pursuant to R.C. 2929.03(F), mandate vacation of the death sentence.

"Proposition of Law No. IV[:] Where the trial court fails to assess a defendant's knowledge of the relevant circumstances and likely consequences of his waiver of jury trial, the court has failed to insure an intelligent, voluntary and knowing waiver of rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 5, 9 and 16, Article I of the Ohio Constitution.

"Proposition of Law No. V[:] Any egregious error in the penalty phase of a death penalty proceeding will be cause to vacate the sentence of death.

"Proposition of Law No. VI[:] Where the trial court allows the admission of improper and prejudicial hearsay testimony, a defendant's conviction is unconstitutional and must be reversed.

"Proposition of Law No. VII[:] The admission of victim character evidence in the guilt-innocence phase of a capital case, and victim impact evidence in the penalty phase is contrary to Ohio law and denies a capital defendant a fair determination of his guilt and sentence.

"Proposition of Law No. VIII[:] Where a state fails to introduce sufficient evidence to prove beyond a reasonable doubt, a conviction for kidnapping is unconstitutional and cannot stand.

"Proposition of Law No. IX[:] The 'presumption' applied in three-judge panel cases that the judges do not consider and are not influenced by any erroneously admitted evidence denies capital defendants due process and equal protection.

"Proposition of Law No. X[:] Misconduct by the prosecutor during the guilt/innocence phase of a capital case eradicates the reliability of the guilt determination.

"Proposition of Law No. XI[:] Any egregious error in the penalty phase of a death penalty proceeding, including prosecutorial misconduct, will be cause to vacate the sentence of death with a subsequent remand to the trial court for a new sentencing procedure. (State v. Thompson [1987], 33 Ohio St.3d 1 [514 N.E.2d 407], followed.)

"Proposition of Law No. XII[:] Hearsay statements are not admissible unless they meet one of the recognized exceptions.

"Proposition of Law XIII[:] Where the trial court allows inadmissible and prejudicial testimony during cross-examination of a witness, defendant's conviction and sentence are rendered unconstitutional and must be reversed.

"Proposition of Law No. XIV[:] In a capital case, the accused is required to be present at every stage of the proceedings unless he, personally, voluntarily absents himself.

"Proposition of Law No. XV[:] Where the trial court admits improper evidence in the guilt/innocence phase of a capital trial, the resulting conviction is unreliable and must be reversed.

"Proposition of Law No. XVI[:] Counsel's performance will be deemed ineffective if it falls below an objective standard of reasonable representation and prejudice arises from

counsel's performance.

"Proposition of Law No. XVII[:]  Where the trial court allows the state to conduct the examination of its own witnesses through the use of leading questions, a defendant is denied rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

"Proposition of Law No. XVIII[:]  The state should not be allowed to cross-exam a defense witness concerning a prior inconsistent statement when such statement is posed without a good faith belief that such statement was actually made.

"Proposition of Law No. XIX[:]  The Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 10 and 16, Article I of the Ohio Constitution and Ohio Revised Code Section 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutorily mandated proportionality process in Ohio is fatally flawed thereby denying appellant Simko the above rights.

"Proposition of Law No. XX[:]  Where the trial court abuses its discretion in denying a defendant's motion to permit the three-judge panel to view the scene, it violates a defendant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

"Proposition of Law No. XXI[:]  The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code, Section 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied."

Wright, J., dissenting.   In my view, the aggravating circumstance, kidnapping, clearly does not outweigh the mitigating factors beyond a reasonable doubt.  I say this for the following reasons:

(1) The appellant was fifty-eight years old at the time of the crime.  Furthermore, he has no record of previous felonious conduct whatsoever.  Appellant's only criminal conviction was for a DWI some years ago.

(2) Appellant's history indicates a dysfuntional family background.

(3) Although appellant has a limited educational background, having completed only the tenth grade, he has had a record of productive employment during most of his adult life and notably spent eight years in the United States Army, receiving an honorable discharge after his service;

(4) There is a substantial amount of testimony in the record with respect to the appellant's reputation and none of the testimony credited by the three-judge panel pointed toward violent activity in his past.  The trial panel gave no credibility to the testimony of James Simko as to previous incidents of domestic violence.

(5) Appellant poses no threat to society in the event of a twenty or thirty year actual incarceration.

(6) Appellant has been a model prisoner.

(7) While it is true that the murder itself was brutal in

character, it has to be noted that appellant has a history of alcohol abuse and was intoxicated at the time of the offense, according to expret testimony that his blood alcohol level at the time of the offense would have been about .14 percent.

(8) Appellant was diagnosed as having avoidant personality disorder. While this does not rise to the level of a mental disease or defect such that it would be a mitigating factor under R.C. 2929.04(B)(3), it does apply to appellant's mental state and should be considered under R.C. 2929.04(B)(7).

(9) Appellant has shown remorse for his actions.

Furthermore, it would appear that the trial panel may well have treated the nature and circumstances of the crime as a second aggravating circumstance insofar as they made detailed findings of fact concerning the circumstances of the crime and used the plural several times in alluding to aggravating circumstances.2 This court has held that it is appropriate to consider the nature and circumstances of the offense as a mitigating factor, but not as an additional statutory aggravating circumstance.

In State v. Johnson (1986), 24 Ohio St.3d 87, 24 OBR 282, 494 N.E.2d 1061, syllabus, this court held "R.C. 2941.14(B) limits the aggravating circumstances which may be considered in imposing the death penalty to those specifically enumerated in R.C. 2929.04(A)." This principle was discused in great detail in State v. Penix (1987), 32 Ohio St.3d 369, 513 N.E.2d 744 and State v. Davis (1988), 38 Ohio St.3d 361, 528 N.E.2d 925.

In State v. Davis, the defendant was convicted of aggravated murder in violation of R.C. 2903.01(A). The death penalty specification count of prior purposeful killing was included in the indictment. The court of appeals upheld the death sentence imposed upon the defendant. This court reversed the judgement of the court of appeals and remanded the cause to the trial court for resentencing because the three-judge panel improperly weighed nonstatutory aggravating circumstances against the mitigating factors. The panel specified what it considered to be the mitigating factors and aggravating circumstances. Its opinion read:

"We find the following aggravated [sic] circumstances have been proved beyond a reasonable doubt:

"1) The manner by which the Defendant purchased the gun, used to kill the victim in this case.

"2) The manner by which the Defendant purchased the ammunition for the gun.

"3) The shooting of the victim, the firing at close range and finally placing the gun almost against her skull and discharging the weapon.

"4) The prior purposeful killing of his wife in 1970 by multiple stab wounds.

"5) Committing the present offense while on parole for the muder of his wife.

"After considering the mitigating factors and the aggravating circumstances proved beyond a reasonable doubt, we unanimously find by proof beyond a reasonable doubt that the aggravating circumstances the Defendant was found guilty of, outweigh the mitigating factors found by this panel." Id., 38 Ohio St.3d at 368, 528 N.E.2d at 932.

Of the five "aggravating circumstances" listed in the

opinion, only the aggravating circumstance described in R.C. 2929.04(A)(5) was a statutory aggravating circumstance. In response, this court stated "the balance of the five circumstances listed by the three-judge panel was outside the statute" and it was therefore improper to consider them. Id. at 369, 528 N.E.2d at 933.

The three-judge panel in this case apparently undertook the same type of flawed analysis. See footnote 1. It is permissible for a court to consider nonstatutory aggravating circumstances if there are no mitigating factors present as there is no danger that nonstatutory circumstances will overcome the mitigating factors in the weighing process. Id., 38 Ohio St.3d at 370-371, 528 N.E.2d at 934, citing Elledge v. State (1977) 346 So.2d 998. However, as specified above, there are numerous mitigating factors present in this case and therefore the nature and circumstances of the offense should not have been considered as an aggravating circumstance. See, also, Zant v. Stephens (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, and Barclay v. Florida (1982), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134.

In addition, I concur in the thrust of the dissent of Justice Pfeifer as it is my belief that the sentence of death in this case is disproportionate and inappropriate given the previous cases decided by this court.

For all these reasons, I would affirm the conviction but reverse the death sentence and remand the matter to the trial panel for resentencing pursuant to State v. Davis (1988), 38 Ohio St.3d 361, 528 N.E.2d 925.

FOOTNOTE:

2  The opinion of the trial panel read as follows:

"REASONS WHY THE AGGRAVATING CIRCUMSTANCES THE OFFENDER WAS FOUND GUILTY OF COMMITTING WERE SUFFICIENT TO OUTWEIGH THE MITIGATING FACTORS.

"1. The Panel finds beyond a reasonable doubt that the Defendant was the principal offender in Count I, Count II and Count III of the indictment.

"2. The kidnapping of Mary Jane Johnson was not a mere restraint of liberty incident to the homocide. ***

"3.Defendant's purchase of a 357 Magnum gun along with hollow point bullets four days before the shooting.

"4. Defendant's decision to go to Durling Elementary School with a loaded 357 Magnum.

"5. Defendant's decision to take only one key to the elementary school, the key to enter the building.

"6. The continued restraint of Mary Jane Johnson after she called for help, by force, for the purpose of terrorizing and/or for the purpose of inflicting serious physical harm.

"7. The circumstance that Defendant had the opportunity and could have released her to safety on at least three different occasions. ***

"8. The circumstance that Defendant left Mary Jane Johnson bleeding to death by the dumpster; that Defendant sought no medical treatment for her, but decided to flee.

"9. Even with no prior criminal history and considering his character and background, the aggravating circumstances clearly outweigh the mitigating factors.

"***

"Finally, in looking at any other relevant factors, we consider Defendant's claim of remorse and his lack of a criminal history.  Balancing the mitigating factors enumerated above against the aggravating circumstances, we conclude that the aggravating circumstances outwigh the mitigating factors beyond a reasonable doubt."  (Emphasis added.)

State v. Simko.

Pfeifer, J., dissenting.  I concur with Justice Wright that the aggravating circumstance in this case does not outweigh the mitigating factors.  I write further because I would hold that the sentence of death is disproportionate, given the particular facts of this case.

The death penalty is special.  That special nature is reflected in the types of crimes punishable by death and by this court's role in the death penalty analysis.

By statute, not every murder is a death-penalty crime. The state of Ohio takes very seriously the awesome responsibility involved in taking a person's life.  The death penalty is reserved for those committing what the state views as the most heinous of murders, such as those committed while the murderer was committing another violent crime, e.g., kidnapping or rape.

This court's role is also special in death-penalty cases. Unlike other criminal defendants, including non-death-penalty murderers, defendants eligible for the death penalty receive an automatic right of appeal to this court.  Part of that appeal is our mandated consideration of "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A).  Proportionality review is a key part of this court's death-penalty review, and as the state's highest court we are in a unique position to determine what is proportionate in a statewide sense.

The focus in most death-penalty cases has been on issues other than proportionality.  Typically, the court locates previous cases with similar statutory aggravating circumstances where the death penalty has been imposed, and thus finds proportionality to the case at issue.  However, murders with the same statutorily defined aggravating circumstance are not necessarily crimes of the same character.  In the present case, for example, the majority cites three cases in its proportionality review.

In State v. Fox (1994) 69 Ohio St.3d 183, 631 N.E.2d 124, the defendant lured the victim into meeting with him by posing as a prospective employer.  He drove her to a remote country road, and when she resisted his advances and tried to escape, he brutally stabbed her.  He then got a rope out of his trunk and strangled her, "just to make sure she was dead."  Id at 195, 631 N.E.2d at 133.

In State v. Seiber (1990), 56 Ohio St.3d 4, 564 N.E.2d 408, the defendant held a bar's patrons at gunpoint, terrorizing them and murdering one, shooting him in the back as he sat at the bar.

In State v. Brewer (1990), 48 Ohio St.3d 50, 549 N.E.2d 491, the defendant kidnapped the wife of his lifelong friend, locking her in his car's trunk for hours as he drove around. At one point the victim was able to scrawl "HELP ME PLEASE" in

lipstick on a piece of paper and stick it through a gap in the trunk seal.  When the defendant learned that the police were looking for him for an explanation, he drove to a remote area, attempted to strangle the victim with his hands and a necktie, and then stabbed her and slashed her throat with a butcher knife.

Thus, even though these cases share the same death-penalty-qualifying aggravating circumstance as the case at issue, the characters of the crimes differ widely.  To rely completely on the crimes of others in determining whether the death penalty is proportionate in a given case demeans our responsibility to review each case individually.

In the present case, Simko technically did commit kidnapping and thus became eligible for the death penalty.  But the death penalty is not for technicalities.  The General Assembly recognized that when it mandated that this court employ a proportionality review.  Our role is basically to determine whether the penalty of death is appropriate in a particular case, given the penalty's role in our overall system of justice.  Our mandate was not prescribed with precision because the type of review involved is not truly capable of precise measurement.  Yet we have been charged with making that call, and as the state's supreme court we ought not back down from making it.

The death penalty is to apply to the worst of cases.  This is not one of those.

Moyer, C.J., concurs in the foregoing dissenting opinion.