[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 367.]

THE STATE OF OHIO, APPELLEE, *v*. SMITH, APPELLANT.

[Cite as *State v. Smith*, 2002-Ohio-6659.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 1999-0905—Submitted July 24, 2002—Decided December 13, 2002.)

APPEAL from the Court of Common Pleas of Richland County, No. 98CR601D.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶1} In April 1998, defendant-appellant, Steven Smith, met and started dating Keysha Frye. A short time later, Smith moved in with Frye and her two young daughters, Ashley, age two, and Autumn, six months. In the middle of September 1998, Frye asked Smith to move out due to his heavy drinking. However, Smith moved back in after he promised Frye that he would stop drinking. Around this same time, Smith was fired from his job and began watching Frye's children while she was at work.

{¶2} On September 28, 1998, Frye arrived home from work at 2:30 p.m. According to Frye's account of what occurred that afternoon and evening, she and Smith left the apartment with her two children. They ran some errands, ate dinner at Burger King, and visited one of Smith's friends, Brett Samples. While visiting Samples, Smith drank three beers and played pool. They left Samples's home at 7:30 p.m. On the way home, Smith purchased a twelve-pack of Busch Ice at a gas station and drank one of the beers in the car.

{¶3} Upon arriving home around 8:00 p.m., Frye locked the apartment's two outer doors. Smith changed Autumn's diaper, fed her, and dressed her in a pink sleeper. At around 10:15 p.m., Smith took Autumn upstairs and put her to sleep in her crib. Frye put Ashley to bed at 10:30 p.m. Frye went back downstairs

and watched television with Smith, who drank more beer. Shortly thereafter, she and Smith went upstairs. Smith removed his cutoff shorts and red underwear, and they had sexual intercourse. Smith did not ejaculate, but Frye stated that he did not seem upset.

{¶4} Frye and Smith then went back downstairs, watched more television, and Smith consumed more beer. Frye went upstairs to sleep at 11:00 p.m., while Smith remained downstairs watching television. Frye checked in on her children and brought Ashley into her bed to sleep with her. Frye left Autumn in her crib. At around 3:22 a.m. on September 29, 1998, Frye was awakened by Smith, who was standing next to her bed, naked. Smith placed Autumn, who was also naked, down beside Frye in bed. Frye went to pick Autumn up and noticed that Autumn's head fell over her arm. She then placed her hand on Autumn's stomach and realized that the baby was not breathing. Frye told Smith that he had killed her baby. In response, Smith threw the alarm clock and said that the baby was not dead.

{¶5} Frye quickly left the apartment with Autumn and Ashley and went to the apartment of neighbors Mya Brooks and Jeff Pierce. Brooks testified that when she opened the door, Frye screamed, "[H]e killed my baby, he killed my baby, Mya, help me." Frye entered the apartment with her children, and Brooks called 911. Before the ambulance arrived, Smith came to Brooks's door, asked what Frye was doing, and exclaimed that "he didn't do anything" and "why was she fucking lying." Brooks shut the door on Smith.

{¶6} Emergency medical personnel arrived and discovered Autumn's nude, lifeless body lying on a blanket. They observed injuries on her head and bruising around her eyes. They began CPR, and Autumn was transported to the hospital. The emergency room doctor testified that upon her arrival, Autumn had no pulse and had suffered a retinal hemorrhage. In addition to her visible bruising, the physician also stated that Autumn had bruising around her rectum and that the opening of her vagina was ten times the normal size for a baby her age—injuries

that are consistent with sexual abuse. After trying to resuscitate Autumn for close to an hour, medical personnel pronounced her dead.

{¶7} In the meantime, shortly after EMS arrived at the scene, Pierce observed Smith throw a trash bag in a dumpster. He heard Smith say that he did not do anything and that he was leaving. Pierce told Smith to stay with him, which he agreed to do.

{¶8} Soon thereafter, the police arrived at the crime scene. Officers entered Frye's apartment and saw no signs of forcible entry. They found that the television had been left on and was extremely loud. Police also discovered the victim's pink baby sleeper under the coffee table and Smith's cutoffs and jeans near the couch. They also found whitish-colored material, later determined to be pieces of shredded diaper, scattered on the floor in the same area near the baby swing and sofa. Small piles of the victim's hair were found on the coffee table. The police also retrieved a garbage bag from the outside trash dumpster that contained a torn baby diaper, Smith's tee shirt, and ten empty cans of Busch Ice.

{¶9} Officer Joseph Dean Petrecky approached Smith, who was standing outside the apartment. Before asking him any questions, Smith told the officer, "I didn't do it, I didn't do it." Smith smelled of alcohol, was disheveled, and swayed back and forth while speaking with the officer. The officer arrested Smith for public intoxication. Later that morning, at 11:00 a.m., Smith's blood-alcohol level was tested and found to be .123.

{¶10} At the police station, Detective Robert Burks interviewed Smith. He told the detective that he had drunk four beers during the entire day and night. He stated that he and Frye had gone to bed at midnight and that he was awakened by Frye, who was accusing him of killing her daughter. On October 27, 1998, Smith gave police a second statement. In that statement, he changed his version of what had occurred. He told police that he had consumed three beers at Samples's house and six additional beers when he returned to the apartment. Smith said that later

that evening, after they had returned home, they put Autumn to sleep in the baby swing and Ashley to sleep on the downstairs love seat. Smith also said they had had sexual intercourse on the living room couch while the two children were asleep in the same room. According to Smith, he woke up at 3:25 a.m. and, believing that something was wrong with Autumn, carried her upstairs while he yelled for Frye. At that point, Frye grabbed Autumn and accused him of killing her.

{¶11} On November 3, 1998, Smith signed and verified the October 27 statement. In answer to followup questions, Smith denied putting trash in the dumpster the morning of the crime and said that the cotton materials found on the living room floor were baby wipes put there by Ashley.

{¶12} The grand jury indicted Smith on two counts of aggravated murder, with two death penalty specifications, under R.C. 2929.04(A)(7) (murder during rape or attempted rape) and R.C. 2929.04(A)(9) (purposely causing the death of someone under the age of 13). Each count also contained a sexual motivation specification and a sexually violent predator specification.

{¶13} At trial, in addition to the foregoing evidence, Dr. Marvin S. Platt, the coroner who performed the autopsy, displayed autopsy photographs and slides and testified that the victim died from compression asphyxia and blunt trauma to the head. Dr. Platt found that the injuries to the victim's head and the abrasions on her forehead, cheek, and chin indicated that the victim was lying on her abdomen and that her face had been forced into a pillow. Contusions to her buttocks indicated that they were subject to pressure from the weight of another person. Dr. Platt further testified that the victim suffered subarachnoid and retinal hemorrhages consistent with shaken baby syndrome, indicating that an attempt had been made to restrain the baby. Other bruising and abrasions revealed that the baby had resisted the attack. The victim was also missing hair from the back of her head, evidence consistent with someone grasping the back of her head. Furthermore, as attested by the emergency room physician, Dr. Platt found that the victim's clitoris

was red, her vagina was enlarged, and there was a hemorrhage in her anus, all indicative of attempted penetration.

{¶14} Forensic evidence revealed human blood on two seat cushions and on Autumn's pink sleeper. DNA tests excluded appellant as the source of the blood. However, DNA from the two couch cushions and the pink sleeper matched the victim's DNA. No semen was found.

{¶15} In his defense, Smith offered the testimony of Robert Forney Jr., a board-certified forensic toxicologist, to support his theory that he was intoxicated when he committed the assault. Forney testified that Smith's blood-alcohol level would have been at least .36 and possibly as high as .60 at 11:30 p.m. on September 28. According to Forney, even an alcoholic with a .28 blood-alcohol level would be intoxicated.

{¶16} Smith called other witnesses on his behalf who testified that he was a heavy drinker who had blacked out in the past. In addition, his former girlfriend, with whom he had a child, and his sister testified that when he watched their children, he took good care of them.

{¶17} The jury found Smith guilty as charged. After a penalty hearing, the jury recommended death on each aggravated murder charge. The state then dismissed the violent sexual predator specification. The trial court sentenced appellant to death on each aggravated murder count, finding that the two aggravating circumstances were not outweighed by any mitigating factors.

{¶18} Smith now appeals to this court as a matter of right.

{¶19} There are 19 propositions of law before us.[1] We have repeatedly held that we need not discuss, in opinion form, every proposition of law raised in a death penalty appeal. We have fully considered each argument advanced and have reviewed the record in its entirety. We have also reviewed the penalty of death for

---

1. Smith originally presented 20 propositions of law for our consideration. However proposition of law 20 has been withdrawn.

appropriateness and proportionality.  Upon review, and for the reasons that follow, we uphold Smith's convictions and sentence of death.

I

Jury Instructions

A.  Guilt Phase

{¶20} In proposition of law one, Smith contends that the trial court erred by refusing to instruct the jury on the lesser included offense of involuntary manslaughter and on voluntary intoxication.  Smith maintains that although he had the intent to commit a sexual assault, he lacked the intent necessary to support a finding of having a purpose to kill and that his intoxication prevented his realizing the severity of the injuries he was inflicting on Autumn.

{¶21} An instruction on a lesser included offense is "required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus.  We find no evidence to suggest that Smith lacked the purpose to kill the victim in this case.

{¶22} Contrary to Smith's contention, he presented no evidence at trial indicating that he intended to sexually assault, rather than kill, Autumn.  Instead, the evidence reveals that Smith purposely killed Autumn while raping or attempting to rape her.  Medical testimony found that the weight and pressure of Smith's body on top of the sixteen-pound baby was one of the direct causes of her death.  The violence of the attack, which was estimated by the coroner to have lasted between ten and thirty minutes, resulted in hemorrhages to her brain and retina and caused her to sustain brain contusions and other contusions on her body.  Witnesses testified that these injuries showed intent to kill.  Consequently, we reject Smith's argument that evidence of purpose was lacking.  Accordingly, we find that the court did not err in denying Smith's request for an involuntary manslaughter instruction.

See *State v. Raglin* (1998), 83 Ohio St.3d 253, 257-258, 699 N.E.2d 482; *State v. Smith* (2000), 89 Ohio St.3d 323, 331, 731 N.E.2d 645.

**{¶23}** We also find that the trial court acted properly in refusing to instruct the jury on voluntary intoxication. It is within the trial court's discretion "to determine whether the evidence presented at trial is sufficient to require a jury instruction on intoxication where the accused claims that his inebriated condition negated the mental state required as an element of the crime charged." *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus; *State v. Nields* (2001), 93 Ohio St.3d 6, 22-23, 752 N.E.2d 859.

**{¶24}** Given the evidence presented, the court did not abuse its discretion. Smith's strongest evidence of intoxication was his expert's testimony, placing his blood-alcohol level between .26 and .6 at the time of the offense. However, a high blood-alcohol level does not compel an intoxication instruction (*State v. Mitts* [1998], 81 Ohio St.3d 223, 229, 690 N.E.2d 522), since even severe intoxication can co-exist with purpose. *State v. Hicks* (1989), 43 Ohio St.3d 72, 74, 538 N.E.2d 1030. The evidence reveals that Smith understood what was occurring after the offenses were committed. He understood that Frye accused him of killing her child and consciously made the decision to throw evidence into a dumpster. Additional testimony from Smith's friends and relatives showed that although Smith was a heavy drunker, he was able to handle his alcohol well. This evidence supports the conclusion that Smith had the intent to murder Autumn. Accordingly, no instruction on voluntary intoxication was required.

**{¶25}** As for the remaining arguments regarding jury instructions, since Smith did not raise an objection, we apply a plain-error analysis. Crim.R. 30(A).

**{¶26}** Smith challenges the court's instruction on an accused's right not to take the witness stand. In particular, Smith objects to that part of the instruction that said that a defendant has the constitutional right not to testify and "*is not called on to advance a theory that may explain something even if it will otherwise remain*

*a mystery.*" (Emphasis added.) Smith contends that the italicized language suggests that he could have explained the mystery surrounding the murder, which implied that he was guilty of the crimes charged. We disagree. The instruction taken as a whole emphasized appellant's right to remain silent. The court further charged the jurors that they "must not be influenced by the Defendant's failure to testify." Although the language Smith complains of was unnecessary, it does not, when viewed in the context of the overall charge, violate his Fifth Amendment rights. We overrule proposition of law one.

{¶27} We summarily reject propositions of law 13 and 19, which address the court's failure to define "principal offender" and the court's use of the statutory definition of "reasonable doubt" as contained in R.C. 2901.05(D). We have repeatedly held that the failure to define "principal offender" does not constitute plain error. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 559, 709 N.E.2d 1166. We have also upheld the statutory definition of "reasonable doubt." See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; *State v. Moore* (1998), 81 Ohio St.3d 22, 37-38, 689 N.E.2d 1.

## B. Penalty Phase

{¶28} In proposition of law five, Smith challenges the trial court's instruction regarding life imprisonment on the ground that it failed to comply with *State v. Brooks* (1996), 75 Ohio St.3d 148, 162, 661 N.E.2d 1030. In *Brooks*, we found that the court erred in instructing jurors that they must unanimously determine that the death penalty is inappropriate before they consider a life sentence. The instruction at hand differs from that of *Brooks* in that the trial court here never advised the jury that it had to unanimously reject the death penalty before considering a life sentence. Instead, the jury was told that it must impose a life sentence if not all twelve jurors agreed to recommend death. The jurors were implicitly told that a single juror could prevent the death penalty. The instructions

were consistent with R.C. 2929.03(D)(2). See *State v. Stallings* (2000), 89 Ohio St.3d 280, 293, 731 N.E.2d 159. Although it is advisable for courts to explicitly instruct the jury that a single juror "may prevent a death penalty recommendation by finding that the aggravating circumstances * * * do not outweigh the mitigating factors" (*State v. Madrigal* [2000], 87 Ohio St.3d 378, 393, 721 N.E.2d 52), the charge as given did not create prejudicial error. We overrule proposition of law five.

**{¶29}** We summarily reject proposition of law 16 regarding the court's refusal to instruct on residual doubt as a mitigating factor, on authority of *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus.

II

Voir Dire

**{¶30}** In proposition of law 12, Smith contends that the trial court erred in denying his challenge for cause against juror Paula Bryant based on Bryant's strong views in favor of the death penalty.

**{¶31}** The standard for determining whether a prospective juror may be excluded for cause based upon his or her views on the death penalty is whether those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (Emphasis omitted.) *Wainwright v. Witt* (1985), 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581. In this case, juror Bryant indicated that she favored the death penalty. However, she later stated that she would listen to all of the evidence and that she would not be predisposed to recommending the death penalty. Instead, she would make the state prove that the aggravating circumstances outweighed the mitigating factors. Since the juror agreed to follow the law, we find that the trial court did not abuse its discretion in denying Smith's challenge for cause. We overrule appellant's proposition of law 12.

III.

Trial Issues

A.  Gruesome Photographs

**{¶32}** In his second proposition of law, Smith argues that his due process rights were violated when the trial court erroneously admitted, over defense objection, 18 gruesome and cumulative photographs and slides of the victim during the guilt and penalty phase of trial.  Smith contends that the photographs were irrelevant and highly prejudicial.

**{¶33}** The admission of photographs is left to the sound discretion of the trial court.  Evid.R. 403, 611(A).  We have previously held that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; See, also, *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267; *State v. Twyford* (2002), 94 Ohio St.3d 340, 357-358, 763 N.E.2d 122.

**{¶34}** The photographs in question reveal marks and abrasions on the victim's face, torso, and buttocks as well as injuries to her lips, ears, scalp, chin, vagina, and rectum.  The autopsy slides depict injuries to the victim's internal organs.  Although the trial judge was at first reluctant to admit the autopsy slides, he was persuaded that their admission was appropriate because they could be used to assist the coroner in his testimony.

**{¶35}** Upon review, we find no reversible error in the admission of the photographs and slides at either phase of trial.  To begin with, although many photographs and slides were admitted, we note that number alone does not require reversal.  As we have previously stated, "the mere fact that there are numerous

photos will not be considered reversible error unless the defendant is prejudiced thereby. Absent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542.

{¶36} Although arguably gruesome, these photographs and slides were relevant in that they depicted the wounds inflicted on the victim, supported the coroner's testimony on cause of death, and helped prove appellant's intent. With respect to the autopsy slides, the trial court reduced the possibility of undue prejudice by refusing to allow the slides to be taken into the deliberation room.

{¶37} Moreover, even if some of the photographs or slides were improperly admitted, we note that any prejudice was harmless considering the overwhelming evidence of Smith's guilt. In addition, any prejudicial impact is minimized by our independent review. See *State v. Davie* (1997), 80 Ohio St.3d 311, 318, 686 N.E.2d 245.

{¶38} For the foregoing reasons, we overrule proposition of law two.

### B. Improper Expert and Lay Testimony

{¶39} In proposition of law six, Smith contends that Dr. Platt, the coroner, and Dr. Battels, the emergency room physician, offered opinions outside their area of expertise. In particular, he objects to the fact that the two physicians were asked to give their opinions about the grid-like patterns on Autumn's face and whether a cushion taken from Frye's sofa could have caused the abrasions. Smith also objects to the physicians' testimony regarding Smith's intent and to the coroner's testimony that Autumn was crying during the attack. We find no merit in Smith's assertions.

{¶40} The doctors' comments on weave-pattern comparisons were not elicited as expert testimony but were instead made in their capacity as lay witnesses. Their testimony was therefore admissible under Evid.R. 701, since it was based upon their visual comparison of the cushion and the marks on Autumn's face. See, e.g., *State v. Jells* (1990), 53 Ohio St.3d 22, 28-29, 559 N.E.2d 464 (police officer's

testimony on footprint comparisons admissible as lay opinion). Furthermore, the doctors' testimony that the victim was resisting and crying and that she was intentionally killed was admissible under Evid.R. 702 and 704. Such testimony was relevant to describing the circumstances of the victim's death and was proper expert testimony on the nature of the death—i.e., that it was not accidental. Proposition of law six is overruled.

## C. Irrelevant and Repetitive Testimony

{¶41} In proposition of law four, Smith argues that he was denied a fair trial because the jury was exposed to repetitive and inflammatory descriptions of the victim's injuries. Thirteen witnesses, including the victim's mother, neighbors at the crime scene, police officers, attending medical personnel, and the coroner, testified about some aspect of the victim's injuries. The non-medical witnesses' testimony was relevant since it helped to explain their actions at the scene and to substantiate that Autumn was severely beaten. The testimony by medical witnesses was likewise relevant in that it was used to establish the cause of death. However, even if the testimony had been repetitive, Smith failed to object at trial, and the admission of such testimony did not result in plain error. Therefore, we overrule proposition of law four.

{¶42} In proposition of law nine, Smith contends that the state introduced irrelevant evidence, including testimony about the victim's height and weight, Frye's work history, and Smith's failure to pay child support and to visit his daughter. No objection was made to such testimony. Upon review of the record, we find that the testimony complained of, even if improper, was not plain error. Consequently, we overrule proposition of law nine.

## D. Hearsay

{¶43} In proposition of law eight, Smith contends that Frye's statements asserting that "he killed my baby" were inadmissible hearsay. Smith maintains that

these statements did not fall within the excited utterance exception to the hearsay rule or to any other hearsay exception.

{¶44} Evid.R. 803(2), the excited utterance exception to the hearsay rule, provides: "Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." One of the requisites necessary to invoke the excited utterance exception is the declarant's "opportunity to observe personally the matters asserted in his statement or declaration." *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus. Since Frye did not personally observe appellant kill her daughter, her statements do not satisfy this requirement. However, even if erroneous, we find that this constitutes harmless error.

## IV. Prosecutorial Misconduct

{¶45} In proposition of law three, Smith alleges several instances of prosecutorial misconduct. The test for prosecutorial misconduct is whether the remarks made were improper and, if so, whether the rights of the accused were materially prejudiced. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Unless otherwise noted, the defense did not object to the purported acts of prosecutorial misconduct and thus waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916.

{¶46} First, Smith argues that the prosecutor made improper comments in his opening statement concerning the victim's physical appearance at birth (her height, weight, and hair and eye color) as well as information concerning Frye's life history. According to Smith, these comments constitute inappropriate victim-impact evidence. However, since the testimony merely elicited background information and was "not overly emotional or directed to the penalty to be imposed" (*State v. Reynolds* [1998], 80 Ohio St.3d 670, 679, 687 N.E.2d 1358), the remarks do not constitute plain error. See, also, *State v. Goodwin* (1999), 84 Ohio St.3d 331, 339, 703 N.E.2d 1251.

**{¶47}** Second, Smith claims error in the prosecutor's reference to him in opening statement as a "baby murderer" and a "baby molester." We have upheld similar remarks as "fair comment." See, e.g., *Nields*, 93 Ohio St.3d at 37, 752 N.E.2d 859, where the prosecutor referred to the defendant as a "mean-spirited derelict." Thus, since the evidence supports such characterization, we find no reversible error stemming from such remarks.

**{¶48}** Third, Smith argues that the prosecution asked leading questions of numerous witnesses and vouched for Frye's testimony by telling her she was doing a good job. Although there were in fact some leading questions, none of these questions resulted in prejudice to Smith. With respect to the prosecutor's comment to Frye, when read in context, it is clear that the prosecutor was simply reassuring Frye in the midst of her difficult testimony. Neither of these circumstances constitutes prosecutorial misconduct.

**{¶49}** Smith next argues that the prosecutor improperly impeached the credibility of defense witness Kathy Foster during another defense witness's testimony. The prosecutor was merely pointing out inconsistencies in her testimony, which was proper cross-examination under Evid.R. 611(B). Smith also contends that it was wrong for the prosecutor to cross-examine defense witness Theresa Sauders about irrelevant issues such as whether Smith paid child support or visited his daughter and to cross-examine his sister, Karen Samples, about why she allowed Smith to watch her child, knowing that he consumed large amounts of alcohol. Defense counsel introduced these topics when Sauders testified on direct examination that Smith was a good father who took care of his daughter and when the witnesses testified that Smith babysat their children.

**{¶50}** Smith next argues that prosecutorial misconduct occurred when the head and leg of a CPR doll came off as the coroner demonstrated the way in which the young victim was injured. No objection was made at the time of the incident, but defense counsel later moved for a mistrial, which the court denied. The record

14

reflects that the incident was accidental and that the prosecutor in no way tried to inflame the passions of the jury. Cf. *State v. Keenan* (1993), 66 Ohio St.3d 402, 408, 613 N.E.2d 203 (stabbing knife into counsel's table). As the trial court noted, "the jury could clearly see the witness was embarrassed when the things fell off the baby, the mechanical dummy, and it is true that several of them were laughing audibly, so again, I don't think it inflamed them in any way. So it is sort of a klutz-type move."

{¶51} Smith also claims several instances of misconduct in the prosecutor's closing argument. We have reviewed each alleged instance and find that even where the comments were improper, they do not result in plain error. For instance, Smith claims misconduct when the prosecutor stated that the victim is "actually speaking to you through the evidence in the case. * * * Autumn Carter, she's crying out to you." These comments, although emotional, were used to tie together the forensic evidence presented during trial that pertained to the victim, such as the clumps of her hair found on the coffee table, bloodstains discovered on the sofa, and diaper fabric found on the floor. Moreover, these comments fall within the wide latitude allowed by a prosecutor in closing argument. See *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754.

{¶52} Furthermore, although the prosecutor's comment that Smith "gets joy or gets happiness out of molesting, raping a six-month old baby" is harsh, it was a comment addressing the sexual-motivation specification. Even if this comment is deemed improper, it does not represent plain error.

{¶53} Smith also objects to the prosecutor's characterization of the crime as being a ten-to-thirty-minute beating. However, this characterization was not improper given the fact that Dr. Platt testified that the attack lasted this long. Smith also believes the prosecutor's statement that "Steven Smith, seated right over there next to his counsel" was prejudicial because it was used to denigrate him and his trial counsel. Likewise, Smith objects to the prosecutor's question, which asked,

"Did he claim accident, that he didn't do this on purpose?"  Smith believes the prosecutor was commenting on his failure to testify.  Smith takes these remarks out of context.  The prosecutor was merely pointing out the defendant to the jury as a means of emphasizing that it was he who committed these heinous crimes. Moreover, the prosecutor was not commenting on Smith's failure to testify but was instead showing how the evidence supports the fact that he purposely committed the crimes in question.

{¶54} Smith next asserts that the prosecutor impermissibly argued "prior calculation and design" because they were not elements of the offenses charged. However, the jury was not misled by these remarks, since the prosecutor informed them that "prior calculation and design" were not issues in the case.  Smith also objects to the prosecutor's suggestion that he was motivated by revenge when he committed the crimes in question.  Although a prosecutor is "entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence" (*State v. Smith* [1997], 80 Ohio St.3d 89, 111, 684 N.E.2d 668), the prosecutor's revenge theory is a stretch, particularly given the fact that Frye herself testified that Smith was not upset when he did not ejaculate during sex. Nevertheless, even if these remarks were improper, they did not affect the fairness of the trial and are not plain error.

{¶55} Smith also claims prosecutorial misconduct occurred when the prosecutor told the jury there would be no instruction on intoxication.  However, we find it was permissible for the prosecutor to point out to the jury that the evidence did not warrant such an instruction.

{¶56} Smith also claims several instances of prosecutorial misconduct during the penalty phase.  Upon review of the record, we find that no prosecutorial misconduct occurred that would have affected the fairness of the trial.

{¶57} First, Smith contends that the prosecutor's opening statement improperly shifted the burden of proof by stating "that there can be no mitigating

facts which outweigh the aggravating circumstances." Second, Smith argues that the prosecutor treated the nature and circumstances of the offense as an aggravating circumstance. While these statements were improper, the court's instructions as to the proper weighing process and its charge as to the precise aggravating circumstances cure any error. See *State v. Stojetz* (1999), 84 Ohio St.3d 452, 465, 705 N.E.2d 329; *State v. Hill* (1996), 75 Ohio St.3d 195, 202, 661 N.E.2d 1068. Third, Smith contends that the prosecutor committed misconduct by comparing him to others who have below-average intelligence and are alcoholics but who do not commit crimes of this magnitude. Such comment is fair rebuttal to defense claims that the jury should consider Smith's intellectual impairment and alcoholism as significant mitigating factors. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶178. Finally, Smith argues that the prosecutor offered his personal opinion by stating that the imposition of the death penalty is "the right decision" to make. While this does convey the prosecutor's personal opinion, the remark was an isolated comment that does not reach the level of plain error. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 646-647, 94 S.Ct. 1868, 40 L.Ed.2d 431.

{¶58} We overrule proposition of law three.

### V. Ineffective Assistance of Counsel

{¶59} In proposition of law ten, Smith claims that he received ineffective assistance of counsel. In order to prevail on this claim, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense so that defendant was deprived of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

{¶60} Smith first complains that trial counsel was deficient by failing to properly request a penalty-phase jury instruction that complies with *Brooks,* 75

Ohio St.3d 148, 661 N.E.2d 1030. In proposition of law five, we found that no plain error arose from the instruction given. Thus, this argument lacks merit.

{¶61} Smith next argues that counsel was ineffective by agreeing to readmit all trial evidence during the penalty phase. In particular, Smith contends that certain evidence was irrelevant, such as the photographs and autopsy slides of the victim, certain testimony of emergency personnel, and medical testimony concerning the cause of death. Under Evid.R. 401, this evidence was relevant since it pertains to the nature and circumstances of the aggravating circumstances. *State v. Jackson* (2001), 92 Ohio St.3d 436, 447, 751 N.E.2d 946. Moreover, our independent sentence reassessment can cure any prejudice stemming from the readmission of this evidence.

{¶62} Smith also contends that his trial counsel's reference to certain irrelevant mitigating factors (victim inducement, victim provocation) during his opening statement in the penalty phase constituted ineffective assistance of counsel. Upon review of the record, it is clear that while counsel initially recited all of the statutory mitigating factors, he later focused in on those relevant factors in his closing. This does not render counsel ineffective. See *State v. Durr* (1991), 58 Ohio St.3d 86, 97, 568 N.E.2d 674.

{¶63} Smith further claims ineffective assistance by pointing to several instances where trial counsel failed to object to prejudicial evidence, improper jury instructions, judicial misconduct, and prosecutorial misconduct. Upon review, we find that none of these allegations, even if deficient, resulted in prejudicial error depriving Smith of a fair trial. Accordingly, we overrule proposition of law ten.

VI. Sentencing Issues

A. Victim-Impact Evidence

{¶64} In proposition of law 15, Smith contends that the trial court committed reversible error by considering victim-impact evidence during sentencing. Prior to sentencing but after receiving the jury's recommendation, the

trial court stated that it had received and considered a letter from the victim's father. In addition, the trial court allowed Frye to make a statement where she expressed her hatred toward Smith and her hope that he would be tortured and killed just as her daughter was killed. Because no objections were made to this victim-impact evidence, it must be examined under the plain-error standard. *Reynolds* (1998), 80 Ohio St.3d at 679, 687 N.E.2d 1358.

{¶65} Victim-impact evidence is permitted where it elicits the effect that the victim's death has had on family members. *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 439, 650 N.E.2d 878. However, victim-impact evidence that expresses an opinion as to the appropriate sentence to be imposed is inappropriate. Id. Frye's opinion that Smith should receive the death penalty was improper victim-impact evidence. Nonetheless, the admission of these statements did not constitute outcome-determinative plain error. Nor does the sentencing opinion show that the trial court considered these statements when sentencing Smith. We overrule proposition of law 15.

## B. Sentencing Opinion

**{¶66}** In proposition of law 17, Smith argues that the trial court in its sentencing opinion failed to give sufficient weight to his long history of alcohol abuse. The weight, if any, to be given a mitigating factor is within the trial court's discretion. *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124. The statute does not require that significant weight be afforded a defendant's alcohol abuse. *Reynolds*, 80 Ohio St.3d at 685, 687 N.E.2d 1358. The trial court did not abuse its discretion by failing to give substantial weight to this factor. Moreover, any error in the trial court's sentencing opinion may be cured by this court's independent review of Smith's death sentence. *State v. Lott* (1990), 51 Ohio St.3d 160, 171-172, 555 N.E.2d 293. We overrule proposition of law 17.

## VII. Independent Sentence Review

**{¶67}** Having considered Smith's propositions of law, we must now independently review the death sentence for appropriateness and proportionality.

## A. Evidence at Penalty Hearing

**{¶68}** In mitigation, five witnesses testified. Jane Mosier, Smith's mother, testified that Smith was the second of four children. Mosier said that Smith's biological father, William Haught, had no contact with him while he was growing up. Mosier later married an abusive man who drank, used drugs, and threatened to burn their house down. Mosier then married Kale Mosier, a "decent guy" whom Smith called dad. He died in 1998. Mosier described Smith as a "good boy" who "loved school," "loved to work," and got along with everybody. She said that Smith left home at seventeen to live and work on a farm. She was first aware that Smith had a drinking problem after he had obtained his driver's license and was convicted of drunk driving. Mosier has had little contact with Smith and for the last couple of years has seen him only once or twice a year.

**{¶69}** Smith's first cousin, Judy Ann Rigsby, grew up with Smith. Rigsby testified that Mosier's first husband physically beat Smith by whipping him with a

belt. She also stated that Kale Mosier was a "very nice man" who took care of Smith. Rigsby further stated that Smith's grandmother was his primary caregiver and that she had always been there for him. She described Smith as an average student. She never observed Smith using alcohol but heard about it from other people.

{¶70} Karen Sue Samples, Smith's sister, testified that Smith received little attention while growing up and that he started drinking alcohol at age nine or ten. She described Smith as a "good boy" who would not hurt anyone. She said the only problem he had was drinking. Samples asked the jury to spare her brother's life.

{¶71} Sergeant Helen Johnson, a corrections officer, testified that Smith committed two minor violations of inmate rules since being incarcerated. Otherwise, she stated that he was respectful towards correction officers.

{¶72} Dr. Janice Ort, a clinical psychologist, interviewed and conducted psychological testing on Smith. Ort found that as a youth, both of his parents were absent from his life. Although his grandmother and aunt helped care for him, they were not a significant, continuous presence. Ort described Smith as an average student in high school who ranked 149 out of 162 students. Ort further noted that Smith's judgment was impaired by alcohol and that he was alcohol-dependent, probably in the middle to late stages of alcoholism. With respect to the crimes charged, Smith told Ort that he had no memory of what transpired other than that he had fallen asleep on the couch, had found Autumn asleep in the swing, and had wondered when he awoke how and why she was there.

{¶73} The test results placed Smith's IQ of 80 in the low-average range of intelligence. In addition, Smith scored low on the information and vocabulary subjects of the Wechsler Adult Intelligence Scale Revised but did fine on basic arithmetic. He also scored low on tests measuring his social skills. The results of the Minnesota Multiphasic Personality Inventory 2 ("MMPI 2") test were within

normal limits, although results indicated possible problems with depression, alcohol abuse, and sensitivity to others. The Rorschach inkblot test indicated that Smith contains his emotions, has difficulty understanding and processing information, and has possible trouble with impulse control. Ort diagnosed Smith with a dysthymic disorder and substance abuse.

## B. Sentence Evaluation

{¶74} After independent assessment, the evidence proves beyond a reasonable doubt the aggravating circumstances charged against Smith. The jury found and the evidence demonstrates that Smith purposely killed Autumn Carter, a child under 13 years of age (R.C. 2929.04[A][9]), while committing or attempting to commit rape (R.C. 2929.04[A][7]).

{¶75} We find nothing in the nature and circumstances of the offense to be mitigating. For ten to thirty minutes, Smith brutally raped and murdered Autumn Carter while her mother was asleep in the apartment. The violent nature of the attack was demonstrated by the fact that Autumn's hair was ripped out, her vagina and anus were seriously damaged, she was suffocated by the weight of Smith on her small body, and she suffered subarachnoid and retinal hemorrhages. This crime is nothing less than a horrific, senseless murder committed against a small, defenseless, six-month-old baby.

{¶76} Smith's history and background provide only modest mitigating value. He was raised by a mother who paid little attention to his well-being, and he had little contact with his biological father. In addition, his mother's first husband was abusive. However, his stepfather, Kale Mosier, and his grandmother were positive influences in his life.

{¶77} Smith's use of alcohol provides little, if any, mitigation. The evidence showed that Smith was aware of what he was being accused of and that while emergency personnel were tending to the victim, Smith was coherent enough to hide physical evidence (including beer cans, a torn baby diaper, and a shirt) in a

trash dumpster outside the building. Thus, we find that the use of alcohol by Smith should have little impact on the weighing process. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916.

{¶78} Of the statutory mitigating factors, only R.C. 2929.04(B)(5) and (B)(7) are slightly applicable. The R.C. 2929.04(B)(5) mitigating factor, lack of a significant criminal record, is entitled to some weight, since Smith's criminal record consists of two DUI convictions and arrests for minor offenses. Under R.C. 2929.04(B)(7), other relevant factors, Dr. Ort testified that Smith suffers from a dysthymic disorder, a personality disorder, and alcoholism. She also said that alcohol had permanently impaired his judgment.

{¶79} Nevertheless, upon independent weighing, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. The death penalty in this case is appropriate when compared to other rape cases, both of which involved victims over the age of 13. See *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932; *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112.

{¶80} Accordingly, we affirm Smith's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and COOK, JJ., concur.

LUNDBERG STRATTON, J., concurs and concurs separately.

_____

**LUNDBERG STRATTON, J., concurring.**

{¶81} While I agree with the majority's judgment affirming the convictions and sentence of death in this case, I disagree with the majority's resolution of the Evid.R. 803 issue.

{¶82} Generally, out-of-court statements offered to prove the truth of the matter asserted are inadmissible hearsay. Evid.R. 801(C) and 802. However, Evid.R. 803 provides numerous exceptions to the hearsay rule:

**{¶83}** "The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

**{¶84}** "* * *

**{¶85}** "(2) Excited utterance

**{¶86}** "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

**{¶87}** Such a statement is admissible despite its hearsay nature if the following four conditions are satisfied:

**{¶88}** " '(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,

**{¶89}** " '(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

**{¶90}** " '(c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and

**{¶91}** " '(d) that the declarant had an opportunity to *observe personally* the matters asserted in his statement or declaration.' " (Emphasis added in part.) *State v. Wallace* (1988), 37 Ohio St.3d 87, 89, 524 N.E.2d 466, quoting *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus.

**{¶92}** The majority concludes that since Frye did not personally observe Smith kill Autumn, Frye's statement does not satisfy this last requirement. I respectfully disagree.

**{¶93}** When Frye went to bed that evening around 11:00 p.m., her daughter Autumn, the victim in this case, was asleep in her crib in her own bedroom, wearing pajamas. Smith was downstairs, drinking beer and watching TV when Frye went to bed. At 3:22 a.m., Smith woke Frye by saying, "I'm laying the baby down beside you." Frye picked up Autumn, and Autumn's head fell over Frye's arm. Frye then put her hand on Autumn's stomach and found that Autumn was not breathing. Frye said to Smith, "[You] killed my baby." Smith replied, "No, I didn't," and threw an alarm clock into the closet. Smith then picked up Autumn, and said that Autumn was breathing and not dead. Frye also noticed that both Smith and Autumn were totally naked.

**{¶94}** Although Frye did not actually see Smith rape and kill her child, when Frye went to bed, Smith was the only one in the house with the baby who could have inflicted the injuries sustained. When Frye awoke, Smith was the one standing next to the bed with the lifeless baby. In addition, while the two were fully clothed at the time that Frye had gone to bed, both Smith and the baby were naked when Frye awoke to this nightmare. I would therefore find that Frye's statement, "[You] killed my baby," falls under the excited utterance exception to the hearsay rule.

**{¶95}** Frye's waking to find her child dead was an occurrence startling enough to produce a nervous excitement in Frye. The statement was made contemporaneous with the event and related to the startling occurrence. Frye personally had observed Autumn sleeping in her crib in her pajamas at 11:00 p.m. and awoke at 3:22 a.m. to find the naked Smith standing beside the bed on which Autumn's limp, naked body lay. I would find that under these facts, Frye personally observed the matters asserted in her statement as required by Evid.R. 803(2).

{¶96} Although the majority finds error in the admission of Frye's statement, the majority concludes, nonetheless, that the error was harmless. Therefore, while I disagree with the majority's rationale regarding the excited utterance, because I agree with the majority's ultimate resolution of this issue and because I would otherwise affirm the convictions and sentence of death, I concur.

————————————

APPENDIX

{¶97} "Proposition of Law No. I:  When a trial court refuses to instruct on relevant issues and makes improper suggestions in instructions given, a capital defendant is deprived of his rights to due process, a fair trial, and reliable determination of his guilt.  Moreover, the refusal to instruct also deprives the defendant of his right to present a meaningful defense.  U.S. Const. Amends. V, VI, XIV; Ohio Const. Art. I §§ 5, 16.

{¶98} "Proposition of Law No. II:  The admission of shocking and graphic photographs and slides into evidence at both phases of a capital trial violates the defendant's right to due process when the probative value of the slides and photographs is outweighed by the danger of prejudice to the defendant, and the slides and photographs are cumulative of other evidence and repetitive of other photographs.  U.S. Const. Amend. XIV; Ohio Const. Art. I, § 16.

{¶99} "Proposition of Law No. III:  A capital defendant is denied his substantive and procedural due process rights to a fair trial when a prosecutor commits acts of misconduct during the trial and the sentencing phases of his capital trial.  He is also denied his right to reliable sentencing.  U.S. Const. Amends. VIII, XIV; Ohio Const. Art. I §§ 9, 16.

{¶100} "Proposition of Law No. IV:  Where inflammatory, repetitive evidence is admitted into evidence a capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence.  U.S. Const. Amends. VIII, XIV; Ohio Const. Art. I §§ 10, 16.

{¶101} "Proposition of Law No. V: Instruction that a jury verdict must be unanimous as to a life sentence is contrary to O.R.C. § 2929.03(D)(2). Instruction that a jury verdict must be unanimous as to a life sentence misleads the jury as to its fundamental role in Ohio's capital sentencing scheme in violation of the Cruel and Unusual Punishment Clause and the Due Process Clause. U.S. Const. Amends VIII, XIV; Ohio Const. Art. I, §§ 9, 16.

{¶102} "Proposition of Law No. VI: A capital appellant's right to due process is violated when the trial court admits improper expert testimony. U.S. Const. Amend. XIV; Ohio Const. Art. I, § 16.

{¶103} "Proposition of Law No. VII: A capital appellant's right to due process is violated when the trial court admits improper lay opinion.

{¶104} "Proposition of Law No. VIII: The accused's rights to confrontation and due process are violated when the state offers hearsay testimony on the ultimate issue of fact in a capital murder case and the out of court declarant did not personally observe the matter to which the witness testified. U.S. Const. Amends. XI, XIV; Ohio Const. Art. I, §§ 10, 16.

{¶105} "Proposition of Law No. IX: Admission of irrelevant evidence during a capital defendant's trial deprives him of a fair trial and due process. U.S. Const. Amend. XIV; Ohio Const. Art. I, § 16.

{¶106} "Proposition of Law No. X: The accused's right to effective assistance of counsel is violated when counsel's performance is deficient and the accused is thereby prejudiced. U.S. Const. Amends. VI, XIV; Ohio Const. Art I, § 10.

{¶107} "Proposition of Law No. XI: Steven Smith's sentence of death is inappropriate. His difficult childhood, history of alcoholism, intoxication at the time of the offense, as well as depression and limited intellectual capacity all favor a life sentence.

{¶108} "Proposition of Law No. XII: The service of a juror at the penalty phase who is biased in favor of the death penalty violates a capital defendant's right to due process. U.S. Const. Amend. XIV; Ohio Const. Art. I § 16.

{¶109} "Proposition of Law No. XIII: Where the trial court fails to instruct on an essential element of two aggravating circumstances that make the accused death eligible, a capital defendant is deprived of his rights to a jury trial, to due process, and to a reliable capital sentencing hearing. U.S. Const. Amends. VI, VIII, XIV; Ohio Const. Art. I §§. 5, 9, 16.

{¶110} "Proposition of Law No. XIV: A capital defendant's right against cruel and unusual punishment and the defendant's right to due process are violated when the trial court implies that mitigating evidence deserves no weight. U.S. Const. Amends VIII and XIV; Ohio Const. Art. I §§ 9, 16.

{¶111} "Proposition of Law No. XV: It is constitutional error for the trial court to consider victim impact evidence in capital sentencing in the form of an opinion by a victim's family member about the proper punishment for the defendant. U.S. Const. Amends. VIII and XIV.

{¶112} "Proposition of Law No. XVI: A capital defendant's right against cruel and unusual punishment under the Eighth and Fourteenth Amendments is denied when the sentencer is precluded from considering residual doubt of guilt as a mitigating factor. The preclusion of residual doubt from a capital sentencing proceeding also violates the defendant's due process right to rebuttal under the Fourteenth Amendment. The preclusion of residual doubt may also infringe a capital defendant's right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments. U.S. Const. Amends. VI, VIII, XIV; Ohio Const. Art. I §§ 9, 10, 16.

{¶113} "Proposition of Law No. XVII: A capital defendant's rights against cruel and unusual punishment and to due process are violated when the sentencing court discounts relevant mitigation because it does not create an excuse for the

substantive offense of aggravated murder. U.S. Const. Amends. VIII, XIV; Ohio Const. Art. I, §§ 9, 16.

{¶114} "Proposition of Law No. XVIII: Ohio's death penalty law is unconstitutional. Ohio Rev.Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 (Anderson 1996), do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Steven Smith. U.S. Const. Amends. V, VI, VIII, XIV; Ohio Const. Art. I, §§ 2, 9, 10, 16. Further, Ohio's death penalty statute violates the United States' obligations under international law.

{¶115} "Proposition of Law No. XIX: A capital defendant's right to due process is violated when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt. U.S. Const. Amend. XIV.

{¶116} "Proposition of Law No. XX: When the trial court ignores the express language of Ohio Rev.Code Ann. § 2929.03(D)(1) (Anderson 1993) and *sua sponte* orders a pre-sentence investigation report which contains prejudicial content, a capital defendant's rights to a reliable death sentence and due process of law are violated. U.S. Const. Amends. V, VI, VIII, XIV; Ohio Const. Art. I §§ 1, 2, 5, 9, 10, 16, 20."

————————

James J. Mayer Jr., Richland County Prosecuting Attorney, and John R. Spon, Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, Ohio Public Defender, Joseph E. Wilhelm, Appellate Supervisor, and Kelly Culshaw, Assistant Public Defender, for appellant.

————————